EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* RAMÓN MARRERO, conocido por MONCHO, acusado y apelante.

No. 4202.—*Sometido:* Junio 27, 1930. *Resuelto:* Marzo 18, 1931.

*C. Coll y Cuchí* y *H. Miranda,* abogados del apelante; *R. A. Gómez,* abogado de *El Pueblo,* apelado.

EL JUEZ ASOCIADO SEÑOR TEXIDOR, emitió la opinión del tribunal.

Un jurado, debidamente constituído, declaró a Ramón Marrero (*a*) Moncho, culpable de un delito de asesinato en segundo grado, y la Corte de Distrito de Arecibo, ante la

que se vió el proceso, le condenó a sufrir la pena de veinte y cinco años de presidio con trabajos forzados. Y contra esta sentencia ha interpuesto la presente apelación.

La acusación en este caso fué, esencialmente:

"Los referidos acusados, Ramón Marrero, c/p Moncho, Carlos Colón y Olimpio Pérez, en la noche del día 4 de septiembre de 1929, en el sitio conocido por 'Junco', del Bo. Hato Abajo, de Arecibo, P. R., que forma parte del Distrito Judicial del mismo nombre, allí y entonces, ilegal, voluntaria, maliciosa y criminalmente, con malicia premeditada y deliberado propósito de dar muerte, demostrando tener un corazón pervertido y maligno, acometieron, agredieron y torturaron a Antonio Rivera, (ser humano) produciéndole varias heridas en el cráneo y cuerpo con una azada, siendo una de dichas heridas (la que le ocasionaron en la región occipital derecha del cráneo, con fractura de éste) la causa de la muerte ilegal de dicho Antonio Rivera, que ocurrió allí y entonces, pocos momentos después."

En el juicio, cuando se hallaba declarando el Doctor Pablo Curbelo, fué éste preguntado por el fiscal si había examinado el cadáver de Antonio Rivera, y contestó que sí, que había hecho su autopsia; el abogado del acusado se opuso a la pregunta si el fiscal no conectaba antes el sitio en que se examinó el cadáver, y si no fuera aquél en que se cometió el delito, conectara este último con el en que se practicó la autopsia, a fin de que conectara si el doctor levantó el cadáver, o si entre el levantamiento y el momento en que el doctor intervino, otras manos que no fueran las de este último intervinieron con el cadáver. La corte declaró sin lugar la objeción, con excepción por la defensa. Ahora, se fundamenta el primer señalamiento de error, sosteniendo el apelante que no se ha demostrado que el cadáver del que se hizo autopsia fuera el de Antonio Rivera.

Del récord (declaraciones de los testigos Fuentes, Maldonado, Justo Marrero, y López) aparece la identificación del cadáver de Antonio Rivera, hasta donde humanamente es posible. El Doctor Curbelo, a menos que conociera personalmente a Antonio Rivera, no tiene otro medio de identificarle

que el informe que recibe del celador del cementerio en donde se hallaba el cadáver; no se trata de un herido, a quien se puede preguntar con esperanza de que responda.

No podemos convenir en la existencia del error señalado.

█ El segundo señalamiento de error se refiere a que la corte permitió que declarase el fiscal Sr. Pérez Casalduc con referencia a los procedimientos de investigación sumarios, antes de la acusación.

Para fundar nuestra decisión, es forzoso copiar del récord lo ocurrido en este estado del proceso:

"Eduardo Pérez Casalduc, juramentado en debida forma, declaró:

"Me llamo Eduardo Pérez Casalduc y ocupo el cargo de Fiscal de Arecibo. Durante el curso de la investigación de este caso que la tomé yo al reanudar mi trabajo, después de una licencia, llamé en una ocasión al acusado Ramón Marrero ante mí, y estuve hablando con él sobre el crimen y me explicó todo lo que había hecho aquella noche, que había estado en el cine, y me dijo, que al llegar a su casa. . .

"Abogado Sr. Coll y Cuchí.—Me opongo a la declaración del fiscal en cuanto se refiera al acusado, a menos que declare bajo juramento que le hizo saber a Marrero que era Fiscal del Distrito y que la declaración que prestaba ante él podía en un tribunal de justicia usarse en su contra como una admisión o confesión.

"Hon. Fiscal.—No se trata de una confesión del acusado, sino de manifestaciones de él, que es muy distinto a una confesión, sino simplemente manifestaciones de él.

"Abogado Sr. Coll y Cuchí.—Las manifestaciones de un acusado hechas a una persona que no sea autoridad pública son voluntarias, pero cuando se hacen a una autoridad pública es necesario que se le dé conocimiento que las está haciendo ante una autoridad.

"Hon. Fiscal.—Si mis manifestaciones llegaran hasta una confesión, acepto que la teoría de la defensa estaba bien; pero no trato de traer una confesión del acusado sino una manifestación de él que no le incrimina si la vamos a estudiar por sí.

"Hon. Juez.—La Corte deniega la objeción del acusado por los fundamentos del caso de *El Pueblo* v. *Quintana,* 39 D.P.R. 197, y por los de *El Pueblo* v. *Del Valle,* 29 D.P.R. 557.

"Abogado Sr. Coll y Cuchí.—Excepción.

"Hon. Juez.—Continúe.

954

—''Me dijo que al llegar a su casa él había encontrado solamente a su mamá y a una señora que vivía con él, que se llama María Abréu, y a Bilí, pero que Marcos Maldonado no estaba allí; y siempre insistí en la presencia de Marcos Maldonado y siempre negó que Marcos Maldonado estuviera en su casa cuando llegó de Arecibo. Después de unos días noté que no se había interrogado a Bilí que es Eleuterio Rivera, y lo mandé a buscar con un detective, y admitió lo que acabo de declarar, que Marcos Maldonado estaba en la casa de él cuando llegó Moncho Marrero de la población, y como estaba en contradicción con lo que había dicho el acusado y Marcos Esquina y lo mandé a buscar y los confronté, y Eleuterio Rivera sostuvo ante Marcos Esquina.

''Abogado Sr. Coll y Cuchí.—Me opongo a eso del careo.

''Hon. Juez.—A menos que no convenza a la Corte no admitirá eso.

—''En esa situación nos pusimos a interrogar a Marcos Esquina y finalmente dijo que quería decir la verdad voluntariamente. Esto ocurrió como a las siete de la noche, siete y media, y lo traje a esta misma sala del Tribunal, y en presencia de dos testigos, Pedro Orpi y este Sr. Nolla, de la Aduana, prestó su declaración, sin que hubiera intimidación de ninguna clase y sin que hubiera ofrecimiento de parte mía para él. También deseo declarar, que al hacerme cargo de la investigación me constituí en el barrio Junco con dos policías y dos detectives, y no conocía al acusado hasta ese día, y llegamos a una tienda que hay en el barrio. . . .

''Abogado Sr. Coll y Cuchí.—Quiero repetir mi objeción, de que el fiscal declara todo el sumario de una investigación hecha, porque lo que puede hacer es traer la prueba, pero no repetir por boca de él lo que haya en la investigación. Puede sentarse a declarar para contradecir a un testigo que le haya hecho manifestaciones, pero no puede sentarse a declarar sobre un testimonio que lo tiene a la mano, que lo puede reproducir, porque sería impedirme el derecho que tengo de repreguntar.

''Hon. Fiscal.—No trato de traer declaración; lo que trato de traer es la conducta del acusado durante la investigación, que es admisible en evidencia. La conducta del acusado durante el tiempo en que se practicó la investigación es admisible.

''Abogado Sr. Coll y Cuchí.—El testigo afirmó que declaraciones hechas ante él corresponden a declaraciones que se han prestado aquí. Es apremiador para mi conciencia. Sé que la única prueba que se tiende a traer ante el jurado es la declaración de un cómplice y de

un fiscal. Eso repugna a mi conciencia de abogado y a la manera de cómo adquirí los conocimientos en mi carrera.

"Hon. Juez.—Indudablemente que el fiscal no debe ni puede traer al conocimiento del jurado hechos que él debe y puede traer con la prueba que él tenga en su poder. Esto no implica, sin embargo, que no se pueda traer ante la corte la conducta de un acusado en o alrededor de la fecha en que los supuestos sucesos tuvieron lugar u ocurrieron. En estas circunstancias la Corte dispone que el testigo no haga referencias a ningún hecho, circunstancia o manifestación de cosas o incidentes que pueden ser traídos por medio de prueba, y que debe concretar su declaración, si es que puede ser prestada y es admisible al propósito manifestado por él de establecer o fijar la actitud del acusado durante los días a que hemos hecho referencia.

"Hon. Fiscal.—Es mi único propósito. El único propósito que anuncié es el siguiente: Las manifestaciones que trato de hacer, trato de llevar al jurado la conducta del acusado durante el tiempo en que practiqué la investigación; lo que noté en él y lo que hizo durante el tiempo en que practiqué la investigación, y no manifestaciones, porque no me voy a referir a manifestaciones de él, fuera de las que dije, sino a la conducta de él.

"Hon. Juez.—Continúe.

—"El primer día que me hice cargo de la investigación me constituí en el barrio Junco y en una tienda que hay en el camino de Junco, propiedad de una persona nombrada Inés Colón Marrero, estaba el acusado, que era la primera vez que lo veía y se me llamó la atención hacia él y noté que inmediatamente que me vió a mí palideció y tenía un papel en la mano. . . .

"Abogado Sr. Coll y Cuchí.—Deseo por lo menos que conste mi objeción a estas manifestaciones del fiscal ahora en esta declaración. Estamos en el tiempo de Torquemada. Es imposible que sea admisible en evidencia decir el fiscal que el acusado palideció al encontrarse con él.

"Hon. Fiscal.—Puedo traer jurisprudencia.

"Hon. Juez.—La Corte sostiene la objeción de la defensa.

—"La noche en que fué traído Marcos Esquina, que prestó su declaración ante mí, después de haber declarado fué llevado a presencia del acusado Ramón Marrero al cuarto del márshal, que estaba en la esquina ésa del edificio de aquí, y estaba Ramón Marrero sentado en una silla y cerca Marcos Maldonadó, y me senté en medio de los dos, y estaba también el detective Colón, y Marcos Esquina relató ante Ramón Marrero la forma en que se realizó el hecho, el crimen.

"Abogado Sr. Coll y Cuchí.—Me opongo a que declare el fiscal

sobre un careo entre el acusado y el testigo ése, acogiéndome a la resolución de la Corte.

"Hon Juez.—No creo haber oído al fiscal que se estableció un careo, sino que estando presente el acusado el testigo Marcos Maldonado hizo las manifestaciones que declaró aquí.

"Abogado Sr. Coll y Cuchí.—Eso es un careo.

"Hon. Juez.—En ese caso la Corte denegaría la objeción por los fundamentos del caso de *Millán,* 35 D.P.R. 889.

"Abogado Sr. Coll y Cuchí.—Si es una discusión entre el acusado y un testigo es un careo.

"Hon. Fiscal.—Para establecer que las manifestaciones de Maldonado fueron oídas por el acusado.

"Abogado Sr. Coll y Cuchí.—No tenemos inconveniente en eso.

—"Marcos Maldonado relató todos los pormenores del crimen en presencia del acusado Ramón Marrero. Cuando Marcos relataba el crimen le dije a Marrero: Marrero, ¿qué hay de eso?

"Abogado Sr. Coll y Cuchí.—Ya es un careo. Nos oponemos a que el fiscal relate el resultado de un careo habido en una oficina de la Corte y en su presencia, entre el acusado y un testigo, desde el momento en que le dice: ¿qué le parece la declaración?

"Hon. Juez.—Denegada la objeción por los fundamentos de *El Pueblo* v. *Millán,* 35 D.P.R. 889.

"Abogado Sr. Coll y Cuchí.—Excepción.

—"Como decía antes, después que Marcos Maldonado relató los pormenores del crimen en presencia del acusado y donde éste podía oírlos, llegó un momento en que le dije: Marrero, ¿qué hay de eso? y dijo: ¿con quién va eso? Y Marcos le dijo: con quién va a ser, contigo; y a esta manifestación de Marcos el acusado lo único que hizo fué sonreírse y no dijo una palabra. También deseo declarar que me constituí en el lugar del suceso e hice un croquis del sitio del suceso, que lo tengo en mi poder, en donde aparece el sitio en donde apareció el cadáver, la casa de Ramón Marrero. . .

"Abogado Sr. Coll y Cuchí.—Nos oponemos a la presentación del croquis y a que el fiscal hable sobre el croquis, porque no forma parte del *res gestae,* por no haberse hecho pocos momentos después de cometido el delito, sin haberse alterado el lugar del *corpus delicti.*

"Hon. Fiscal.—Este caso está resuelto por la Corte Suprema en el caso de *El Pueblo* v. *Morales,* en que se presentó una fotografía que fué admitida, de muchos días después. La jurisprudencia es la misma respecto a croquis, mapas, fotografías.

"Abogado Sr. Coll y Cuchí.—En un procedimiento civil no puede admitirse la presentación de un croquis sin que la parte contraria

haya tenido intervención en el levantamiento del croquis. ¿Cómo es posible que se admita un croquis hecho por el fiscal sin la intervención del acusado y mucho después de haberse cometido el delito? Una fotografía es la representación exacta y un croquis puede variarse sin intención.

"Hon. Juez.—La Corte sostiene la objeción.

"Abogado Sr. Coll y Cuchí.—No tenemos nada que preguntar."

Es cierto que es peligroso que pueda el funcionario que practica una investigación en asunto criminal, ocupar, en el juicio, la silla del testigo. Puede insensiblemente, y sin quererlo, trasponer los límites de lo que puede declarar y entrar en un campo vedado por las reglas del procedimiento. La ley ha querido dar al acusado una sólida garantía de sus derechos, ante la que, en cierto modo, ceden las garantías sociales y generales. Pero como para todo hay un límite, y como es posible que el jurado que va a rendir un veredicto tenga una información seria en que fundar su creencia y su juicio, hay extremos sobre los que puede prestarse aquella declaración. En la que aquí prestó el fiscal, hay un momento en que éste dice:

"Hon. Fiscal.—Para establecer que las manifestaciones de Maldonado fueron oídas por el acusado."

Y la defensa:

"Abogado Sr. Coll y Cuchí.—No tenemos inconveniente en eso."

Acerca de que las manifestaciones de Maldonado en la investigación, fueron oídas por el acusado, y cuál fué la actitud de éste, pudo correctamente declarar el fiscal.

En el caso *El Pueblo* v. *Millán,* 35 D.P.R. 889, que se nos cita por el fiscal de este tribunal, aparece que se había permitido a Domingo Quiles que relatase ante el jurado ciertas manifestaciones hechas por Francisco Acevedo, y la actitud que observó el acusado. Este tribunal dijo:

"El apelante sostiene que las manifestaciones hechas por Acevedo y declaradas por Quiles no eran admisibles porque no hacen referencia a él ni fueron hechas en su inmediata presencia. Sin embargo,

de los autos aparece que fueron hechas por Acevedo en voz alta, que el apelante estaba cerca, que podía oírlas y que se sonreía cuando fueron hechas por lo que no puede sostenerse que las manifestaciones de Acevedo no fueron hechas en su inmediata presencia; manifestaciones que no se refieren solamente a Acevedo pues dijo, en plural, que aquella noche habían gozado mucho, sin que Millán hiciera objeción y antes al contrario se sonreía, lo que puede considerarse como asentimiento a dichas manifestaciones; y esas manifestaciones de Acevedo, que también fué acusado y condenado por violación de esa niña, eran admisibles porque no estaban faltas de conexión con la conducta del apelante cuando fueron hechas por Acevedo. En el caso de *People* v. *Mallon,* 103 Cal. 514, había sido permitido a dos testigos que declarasen ciertas manifestaciones hechas por Foran, que había sido acusado con Mallon de ataque para cometer robo, y se declaró lo siguiente:

" '. . . Esta declaración, por sí sola y sin relación alguna con la conducta del apelante al tiempo de hacerse las supuestas manifestaciones, sería, sin duda, claramente de referencia e inadmisible. Pero es una regla ya establecida de derecho que si bien una manifestación hecha en presencia del acusado no es admisible por ser prueba de un hecho narrado en tal manifestación, es admisible, primariamente con el fin de demostrar que el acusado asintió a tal manifestación, ya por consentimiento expreso, o con su silencio, o con tal conducta que claramente implicaba tal consentimiento. (People v. McCrea, 32 Cal. 98; People v. Estrado, 49 Cal. 171.) Tal testimonio debe, sin duda, recibirse con cautela; si no es seguido por alguna prueba de la conducta del acusado debe eliminarse; y si el abogado del acusado lo solicita (lo que no se hizo en este caso) la corte debe instruir al jurado que tal manifestación se admite únicamente para probar el fin arriba indicado. Pero la corte no comete error al admitir tales manifestaciones desde el primer momento. En el presente caso creemos que aparece claramente. cuál era la conducta del acusado cuando Foran hizo sus manifestaciones, las que éste no negó. Durante la declaración de Crockett acerca de tales manifestaciones y después del abogado del acusado presentar una objeción, la corte dijo: "asumo que se sabrá lo que este acusado dijo e hizo en el curso de la conversación"; y la corte entonces preguntó al testigo: '¿qué dijo este acusado?' a lo cual el testigo contestó: 'El no dijo nada cuando le dijeron eso,' y después el testigo dijo 'Estábamos todos formando un grupo. El acusado, Mallon, no dijo nada.' Después del testigo Donovan declarar a ciertas manifestaciones hechas por Foran al acusado, dijo que 'éste no contestó nada.' Y, además,

que cuando el testigo le preguntó al acusado 'Tu estabas allí?' éste le contestó 'Te imaginas que soy tan tonto que te voy a decir que estaba allí?'' ' ''

No es preciso citar más autoridades acerca de este particular, y para decidir en contra del señalamiento de error.

El tercer señalamiento se enuncia así:

"Tercer error.—La corte erró al declarar sin lugar la moción del acusado para que se ordenara una absolución perentoria por falta de prueba."

Bajo este título se discute por el apelante la cuestión de testimonio del cómplice, y corroboración necesaria.

No hemos de entrar en la consideración de hasta dónde pueda justificarse la creencia de que el cómplice esté dispuesto, por su interés, a mentir al declarar. Quizá pudiera justificarse el consejo que se diera a los jurados para que pusieran la mayor cautela al pesar la declaración del cómplice, sin que lo sea tanto el hecho de traer ese recelo al estatuto. Ese no es nuestro propio fuero. Pero de todas formas, como sostiene el fiscal de este tribunal, ha habido la necesidad de sujetar el precepto a limitaciones discretamente introducidas por la jurisprudencia, que el mismo funcionario señala en su alegato; y entre ellas, las más importantes son aquéllas que hacen referencia a la discreción de la corte, y a la libertad de apreciación de la prueba por el jurado.

Marcos Maldonado, cómplice, declaró que había tenido una entrevista con Moncho Marrero, el acusado, una noche, antes de la muerte de Antonio Rivera, y que Moncho le había dicho que le iban a coger los chavos a Rivera y que necesitaba al testigo y a Olimpio Pérez para que velaran, le indicó que fuera a buscar a Olimpio y Carlos Colón, para que éstos fueran a casa de Justo, le llamaran y le dijeran que le estaban robando las gallinas, a ver si hacía algún disparo, y luego se aguardaran en la entrada del callejón, y así lo hizo el testigo; fueron y llamaron a Justo Colón Marrero, y le

dijeron que le estaban robando las gallinas, y cuando él se estaba levantando, echaron a correr, y fueron al callejón, donde les aguardaba con una azada, y mandó a Olimpio a la parte abajo, al testigo a la parte arriba, y a Colón a llamar a Rivera, mientras él sacaba la vaca, y así lo hicieron; que Rivera se levantó y fué detrás de la vaca, a la que Moncho amarró de la raíz de un palo de cupey, y él se subió a la parte arriba; que al llegar Antonio Rivera, fué a soltar la vaca, y Moncho desde arriba le dió con la azada, y Colón le echó mano al machete que llevaba Rivera, y le entró a tajos, y Moncho a golpes con la azada, y cayó Rivera gritando "Moncho, no me maten," y cuando ya no se movía Rivera, le registraron y le sacaron una bolsa con dinero y un revólver, y se fueron; se repartieron el dinero en casa de Carlos Colón.

El testigo Justo Marrero dijo que en la noche del 4 al 5 de septiembre se levantó como a las 3 ó 4 de la madrugada, para ordeñar y a las 5 fué al pueblo para buscar el pan, y al volver, vió a alguna gente, y el cadáver de Antonio Rivera, en la zanja, al lado de un barranco, y vió allí un cabo de azada, y una vaca amarrada de un palo de cupey; que la noche antes del crimen se acostó temprano, y que sintió los perros ladrando a eso de las 11:30, y se levantó, y por el balcón disparó dos tiros, y se fijó en la casa de su sobrino, el acusado, que queda en frente, y en la que había luz.

Eleuterio Rivera, o Bilí, tío del acusado, dijo que la noche antes de la muerte de Antonio Rivera, vió a Marcos Maldonado en la casa de Moncho, el acusado, en donde estuvo hasta las diez, hora a que llegó Moncho, y que ellos no hablaron, y Moncho Marrero se acostó y durmió en la casa.

Eladio López Torres dijo que después de la muerte de Antonio Rivera, vió a Moncho Marrero, que algunas veces iba por la tienda del testigo, y una vez, cuando le preguntó éste por la azada, dijo Marrero: "Esa azada tiene mi nombre, pero Monchos habemos bastantes."

Francisco Rivera Classen, hermano de Antonio Rivera, entre otros extremos de su declaración se refirió a un disgusto entre su hermano y Moncho, por cierto arrendamiento de casa, y habló asimismo de que su hermano tenía dinero, y que lo llevaba encima, en dos bolsas de lienzo y de hule, y que eran alrededor de trescientos dollars.

Francisca Miranda, amante de Eustaquio Rivera (a) Bilí, dice que al día siguiente de ocurrido el crimen estuvo en su casa Moncho Marrero, y dijo que no entraba porque estaba todavía nervioso, y ella le preguntó por qué, y él le contó que si no sabía del crimen y le explicó la forma en que se suponía que había ocurrido, que suponía que al hombre le habían llamado para desamarrar la vaca que le estaban robando, y se tiró, y cuando estaba soltando la vaca, de arriba le dieron, que le habían amarrado la vaca alto, cosa de tirarle de arriba cuando la estuviera desamarrando, que Moncho volvió otra vez el domingo, y la testigo estaba acostada, y él preguntó por ella, y luego hablaron abajo, estando en juego, y dijo uno: "di que le mataste, no lo niegues," y que no sabe los que estaban.

Eustaquio Rivera, dijo que vió a Moncho Marrero en casa de Paca la noche del día en que se cometió el crimen, y luego otra vez que fué con varios más, entre ellos uno que está acusado, y que la noche que vinieron tocaron y preguntaron por Paca, que estaba enferma, y viraron; que les oyó en cuestión de relajo, que decían: "tú fuiste quien lo mataste"; que cree que estaban metidos en fiesta.

Aparte de este testimonio, y acerca de algún otro punto interesante, declararon:

El Doctor Curbelo, sobre la autopsia. De su testimonio la parte más interesante se refiere a las heridas que se notaban en el cadáver, y que eran una contusa en la región occipital derecha, con fractura del cráneo, otra incisa entre las regiones frontal y parietal; fractura de la mandíbula inferior derecha; fractura del cúbito, brazo derecho; dos heridas in-

962

cisas en el brazo izquierdo; destrucción del lóbulo occipital derecho del cerebro; hemorragia, etc.

El policía insular Guillermo Fuentes, dijo que el 5 de septiembre por la mañana tuvo conocimiento del crimen, fué al sitio y encontró el cadáver de Antonio Rivera, en un camino vecinal, el del Junco, en una cuneta, donde hay dos barrancos, y el camino en el centro; que la parte donde estaba la vaca amarrada y en donde se veían machetazos pegados es bastante alta; la vaca estaba amarrada de la raíz de un árbol, no sabe si de hicaco; encontró una azada, un cabo de azada partido, con sangre y fango. Reconoce la azada que se le muestra.

Manuel Barrios, policía insular, que también fué al sitio en que se encontró el cadáver, y vió la azada, y le arregló el mango, dice que en éste había un nombre escrito con lápiz, que dice "Moncho" o "Maldonado." Reconoce la azada que se le muestra.

La defensa, al terminar la prueba de la acusación, pidió se instruyera al jurado para una absolución perentoria, fundándose en que el testimonio de un cómplice, no es suficiente, si no hay evidencia corroborante, y que en este caso no la hay. La petición fué negada por la corte; y la defensa se abstuvo de presentar prueba.

La instrucción al jurado fué cuidadosa y completa; cubre todos los extremos necesarios, y se ajusta a los dictados de la ley y la jurisprudencia. En cuanto al testimonio del complice, la instrucción dada fué ésta:

"De la prueba practicada por el fiscal aparece la declaración de un testigo que se llama Marcos Maldonado. Se ha alegado en este caso por la defensa que Marcos Maldonado es un cómplice y que su declaración debe ser corroborada con alguna otra prueba. La Corte instruye a los Sres. del Jurado que efectivamente Marcos Maldonado es un cómplice del delito que se le imputa a este acusado. Siendo un cómplice es necesario que su declaración esté corroborada. La declaración de un cómplice tiene que estar corroborada con alguna otra prueba que por sí misma, y sin la cooperación de las manifes-

taciones del cómplice, tienda a conectar al acusado con la comisión del delito. La corroboración que se requiere es, pues, aquella prueba que sin la ayuda del testimonio del cómplice tienda a demostrar la relación del acusado con la comisión del delito. No es necesario que la prueba corroborante sea directa, pues bien puede ser circunstancial o de indicios. Pero esa prueba de corroboración es necesario que tienda siempre a demostrar y muestre a vuestro juicio la culpabilidad del acusado o sea suficiente para relacionarlo con la comisión del delito, no siendo bastante dicha corroboración si sólo prueba la perpetración del delito o las circunstancias del mismo.

"La declaración de un cómplice queda corroborada cuando, eliminada la evidencia del cómplice, existe prueba tendente a conectar al acusado con el delito imputado. Se sugiere esta forma como una prueba adecuada; eliminad del caso la declaración o evidencia del cómplice y entonces examinad la evidencia de los otros testigos con el objeto de determinar si hay prueba inculpatoria, prueba tendente a conectar al acusado con el delito. Si existe, el cómplice está corroborado. Si no existe ninguna prueba inculpatoria, no hay corroboración, aunque el cómplice pueda ser corroborado en cuanto a cualquier número de otros hechos por él jurados. Esa teoría está basada en las siguientes disposiciones legales del artículo 253 del Código de Enjuiciamiento Criminal: 'No procede la convicción por declaración de un cómplice, a no ser que ésta sea confirmada por alguna otra prueba que, por sí misma y sin la ayuda del testimonio del cómplice, tienda a demostrar la relación del acusado con la comisión del delito; no siendo suficiente dicha corroboración si sólo prueba la perpetración del delito o las circunstancias del mismo.' La Corte instruye al Jurado que la prueba necesaria para corroborar la declaración de un cómplice debe ser de tal naturaleza que ella permita conectar al acusado con la comisión del delito.

"Si vosotros creéis, Sres. del Jurado, que eliminado el testimonio del cómplice Marcos Maldonado, por las otras declaraciones hay prueba suficiente para condenar al acusado, entonces vuestro deber es declararlo culpable y rendir un veredicto en este asunto. Pero, si por el contrario, vosotros creéis que, eliminada la declaración de Marcos Maldonado, no hay prueba suficiente para llegar a la conclusión de que este acusado es autor del delito que se le imputa, entonces debéis traer un veredicto absolviendo al acusado. No es suficiente el que vosotros creáis, en este caso, el testimonio del cómplice como verdadero para poder declarar culpable al acusado, aun cuando creyereis que el cómplice ha dicho la verdad para poder declarar al acusado culpable. Es necesario que las otras declaracio-

nes por sí mismas sean suficientes para conectar al acusado con el crimen, sin tener en cuenta la declaración del cómplice. Y si vosotros creéis que las solas declaraciones de los demás testigos sin la del cómplice son insuficientes para conectar al acusado con el delito, os repito que es vuestro deber absolverlo.

"Francisca Miranda, durante su declaración hizo ciertas manifestaciones que dice ella que hizo el acusado. La Corte admitió la prueba de esas manifestaciones para ser consideradas por el Jurado, y les instruye, que si después de considerar toda la prueba estimaren que las manifestaciones no fueron el resultado de actos voluntarios del acusado, deben rechazarlas o de lo contrario admitirlas, para darles el valor probatorio que merezcan, siendo también cuestión para el jurado determinar la credibilidad de la testigo que produjo esas manifestaciones. Las manifestaciones que se imputen a un acusado deben haber sido hechas libre y voluntariamente, sin haber sido inducido a hacerlas por amenazas, violencia o estímulos o influencia indebida o promesa de alguna autoridad o esperanza de algún castigo más leve o de algún beneficio que habría de derivarse a su favor.

"Y con respecto a cierta prueba de carácter indiciario ofrecida en este caso debo instruir a los Sres. del Jurado que existen dos clases de prueba reconocidas y admitidas por las cortes de justicia, en virtud de cualquiera de las cuales puede el jurado encontrar a un acusado culpable de un delito. Una de ellas es el testimonio directo o positivo de un testigo ocular respecto a la comisión del delito. Esta se llama prueba directa. La otra clase de prueba es aquélla producida por testimonio de una serie de acontecimientos entrelazados entre sí, que tienden a señalar, de manera suficientemente poderosa, la comisión de un delito por el acusado. Esta es conocida como prueba circunstancial o de indicios. La misma puede consistir en planes concertados para la comisión del delito o en cualquier acto, declaración o circunstancia, admitidos como prueba, que tienda a establecer la conexión del acusado con la comisión del delito. Nada hay en la naturaleza de la prueba circunstancial que la haga menos segura que la otra clase de prueba, o sea, la directa. La Corte instruye al jurado que para declarar culpable al acusado por evidencia circunstancial solamente es necesario, no sólo que todas las circunstancias concurran para demostrar que él cometió el delito de que se le acusa, sino que ellas sean inconsistentes con cualquiera otra conclusión razonable. No es suficiente que las circunstancias probadas coincidan, concuerden y hagan probable la' hipótesis buscada para establecer el objeto de la acusación, sino que deben excluir

cualquier otra hipótesis fuera de la culpabilidad. Es decir que en casos de prueba de indicios deben probarse hechos que sean no solamente compatibles con la culpabilidad del acusado sino también incompatibles con toda razonable hipótesis de inocencia; y cada hecho aislado del que se ha de hacer la deducción de culpabilidad, debe demostrarse por medio de prueba que satisfaga el ánimo y la conciencia del jurado en el mismo grado en que es necesario satisfacérla con respecto al hecho en cuestion en casos en que la prueba es directa.''

El apelante y el apelado, en extensos y bien razonados alegatos, han discutido este punto, ofreciendo numerosas citas de autoridades, que no hemos de repetir.

A nuestro entender, el jurado encontró la corroboración necesaria para formar un juicio, y rendir un veredicto que satisficiera las conciencias individuales de sus hombres, y la colectiva de su tribunal de hecho, en los siguientes extremos:

Las declaraciones de Francisca Miranda y Eleuterio Rivera.

La azada, y las declaraciones con respecto a ella, así como el sitio en que se hallaba amarrada la vaca, los cortes de machete en aquel sitio, y el en que se encontró el cadáver.

Y principalmente, la conversación que tuvo el acusado con la testigo Francisca Miranda.

Desde luego, por sí solos, estos elementos no establecen de manera indubitable la culpabilidad del acusado Marrero; pero de exigirse esto, la sociedad tendría que renunciar a perseguir los delitos en los que no se ofrecieran testigos de visu, que los criminales no suelen llevar consigo para ese solo fin.

En el caso *El Pueblo* v. *Robles*, 13 D.P.R. 309, este tribunal dijo:

''No es necesario que la prueba corroborante sea directa, pues bien puede ser circunstancial, siempre que demuestre la culpabilidad del acusado, o sea suficiente para relacionarlo con la comisión del delito.''

En el caso *People* v. *Mayhew*, 30 N.Y.C.A. Rep. 1076, 44 N. E. 971, que cita El Pueblo, leemos:

"La corroboración del testimonio de un cómplice en un juicio por asesinato, es suficiente para llenar los requisitos del artículo 399 del Código Penal de New York, que provee que la evidencia corroborativa debe tender a conectar al acusado con la comisión del delito, cuando la declaración de dicho cómplice con respecto a la hora en que se cometió el crimen es corroborada por otros testigos. Cuando sus manifestaciones con respecto al arma empleada han sido corroboradas por el carácter de la herida y el descubrimiento de diferentes artículos acerca de los cuales declaró fueron encontrados en sitios donde él declaró que el acusado los había arrojado y cuando hay otra evidencia que tiende a conectar al acusado con ciertas partes del arma encontrada, y una llave que pertenecía al difunto fué encontrada donde el cómplice manifestó que el acusado la había tirado y cuando habiendo sido el muerto robado en su persona se demuestra que el acusado tenía una cantidad de dinero en su poder poco después del crimen."

¿A quién ha de dejarse el juicio de la corroboración suficiente? Nos parece que si la corroboración ha de producir el efecto de originar una creencia y basar sobre ella una resolución, aquel juicio ha de dejarse al que tiene que creer para decidir. La función no puede hacerse técnica, sino que es de estado de conciencia. No podemos dejar al jurado en una situación de abandono en medio del oleaje de los tecnicismos. Estos son buenos para que a ese tribunal de hecho no llegue lo que no debe llegar, pero no para dirigir el veredicto que es expresión de la conciencia ingenua de los doce jueces de hecho.

No se argumenta en el sentido de que el veredicto se halla manchado por un error en la apreciación de la prueba.

No existe el error señalado.

Por las razones expuestas, *debe confirmarse la sentencia apelada.*