EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* CONFESOR MÉNDEZ, acusado y apelante.

No. 2950.—*Sometido:* Junio 12, 1928. *Resuelto:* Mayo 28, 1929.

654

*Luis Muñoz Morales*, abogado del apelante; *José E. Figueras*, abogado del *El Pueblo*, apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

Confesor Méndez fué denunciado ante la Corte Municipal de San Juan como autor de un delito de *acometimiento grave* realizado como sigue:

"Que el 4 de noviembre, hora 1:35 A. M., de 1925, y en la Avenida Ponce de León, parada 16 y ½, Santurce, distrito judicial municipal de San Juan, . . . en el zaguán del Casino Hijos del Oeste, maliciosa y voluntariamente, con intención criminal de causar grave daño corporal en la persona de José Lago, le acometió con un revólver Colt, calibre 32, No. 67940, haciéndole dos disparos sin lograr herirlo."

La corte municipal dictó sentencia condenatoria contra Méndez. Éste apeló para ante la corte de distrito. Celebrado el juicio de nuevo, también la corte de distrito dictó sentencia condenatoria contra Méndez, imponiéndole tres meses de cárcel y las costas. No conforme aún, apeló para ante este tribunal señalando en su alegato la comisión de tres errores, así:

"1.—La denuncia en este caso no imputa un delito de acometimiento y agresión con circunstancias agravantes.

"2.—La Corte erró al admitir la declaración del testigo Aureliano Martínez, para impugnar la credibilidad de un testigo (José Lago), contra la oposición y excepción del apelante.

"3.—La sentencia apelada es contraria a la ley y a la prueba."

■ Discutiendo el primer error sostiene el apelante que la denuncia no imputa un delito de "acometimiento y agresión con circunstancias agravantes" porque de ella misma resulta que no hubo agresión ya que admite que el acusado *no logró herir* a la persona contra quien disparó.

Así es en efecto, pero también de los expresos términos de la denuncia resulta que no se formuló por "acometimiento y agresión con circunstancias agravantes" sino por "acometimiento grave"; y que este delito existe, fué resuelto claramente desde 1917 en que la cuestión fué suscitada en este tribunal en el caso de *Lange* v. *El Pueblo,* 24 D.P.R. 854.

La jurisprudencia quedó establecida así:

"Las secciones 1 a la 8 inclusive de la Ley de 10 de marzo de 1904 para determinar y castigar acometimiento, acometimiento y agresión, acometimiento con circunstancias agravantes, y acometimiento y agresión con circunstancias agravantes y para derogar la secceión 237 del Código Penal, han sido copiadas literalmente de las secciones 587, 593, 594, 595, 601, 602 y 103 del Código Penal de Texas, con excepción de algunos cambios insignificantes.

"En la Ley de acometimiento y acometimiento y agresión de 10 de marzo de 1904 no se ha tratado de establecer un delito distinto por separado con la mera enumeración en su sección 6ª. de las circunstancias agravantes y de la imposición de castigo mayor tanto al acometimiento como al acometimiento y agresión, pues demuestra la historia, contexto y propósito claramente expresado de la ley, que la legislatura, al prescribir que el 'acometimiento y agresión' será considerado con circunstancias agravantes en los casos que menciona, quiso decir 'acometimiento o agresión'; interpretación que está en completa armonía con el espíritu y texto de los artículos 3 y 359 apartado 14 del Código Penal y no violenta el verdadero principio de interpretación rigurosa como ha sido considerado y aplicado por las mejores autoridades modernas que 'sólo reconocen una regla como absolutamente invariable, o sea que debe descubrirse y hacerse cumplir la verdadera intención y deseo del poder legislativo.' "

■■ El segundo error o sea el que sostiene "que no debió admitirse la declaración de Aureliano Martínez para contradecir la declaración del testigo del Pueblo José Lago," es el que ha dado lugar a una amplia discusión en el seno de

la corte. Para poder formar concepto de la verdadera cuestión suscitada y resuelta por la corte de distrito, es necesario narrar todos los hechos ocurridos en la forma en que se fueron desarrollando.

Ya hemos dicho que se trata de una causa que comenzó por denuncia presentada en una corte municipal. Apelado el caso para ante la corte de distrito, intervino en el nuevo juicio en representación del pueblo el fiscal.

El primer testigo que se llamó a declarar fué el policía Aureliano Martínez. Dijo que se encontraba de servicio en la demarcación a que se refiere la denuncia y como a las dos de la mañana oyó dos disparos, corrió y frente al Club encontró mucha gente aglomerada; por los informes que le dieron subió al casino, ocupó un revólver que estaba sobre una silla y arrestó al acusado.

Seguidamente el fiscal llamó a declarar a la persona que en la denuncia aparecía como aquella contra quien se había realizado el acometimiento, José Lugo, o Lago, como en la denuncia se dice.

Declaró que había sentido las dos detonaciones; que no sabía quién las hizo; que se fué del sitio y vió al acusado como media hora después cuando "volví y ví un gentío cerca del casino y entonces ví al guardia Martínez con el señor ese" refiriéndose al acusado. Siguió preguntándole el fiscal y él contestando, así:

"P.—¿De dónde salieron esos dos disparos?—R.—No sé.—P.—¿Ni vió quién los hizo tampoco?—R.—No, señor.—P.—¿Ud. declaró en la Corte Municipal?—R.—Sí, señor.—P.—¿Es eso mismo que ha declarado aquí?—R.—Sí, señor.—P.—¿Está seguro?—R.—Sí, señor."

Entonces el fiscal solicitó de la corte que se practicara una investigación sobre lo declarado por el testigo en la corte municipal citándose al juez municipal "para cualquier día que se señale." Manifestó el juez: "Si él ha dicho una cosa distinta allí que nosotros no sabemos." Y el fiscal contestó: "Por eso pido la investigación. Si lo supiéramos ya hubié-

ramos ordenado el arresto del testigo." Intervino la defensa así: "Me opongo, eso lo puede hacer después del juicio, pero eso no parece sino para impresionar." Replicó el fiscal: "Al juez yo no trato de impresionarlo," y dijo la defensa: "Yo lo sé que al juez no le impresiona nadie. Del juez estoy completamente tranquilo." Terminó el fiscal diciendo: "Nada más" y la defensa: "Nada."

Acto seguido el fiscal llamó al testigo Ramón Quiñones. Entre otras cosas declaró, contestando al fiscal:

". . . ví al señor Confesor Méndez que se apeaba del Club diciendo 'dónde está José Lago, ese hijo de la gran puta, que lo voy a asesinar' y siguió y anduvo de la puerta del Club como doce metros y viró para atrás y entonces, a los cinco minutos de estar parado en la puerta venía José Lago de la parada 16 para el Club y entonces el señor Bernardino González llegó y cuando venía José Lago avecinándose adonde Confesor, se paró a hablar con él, pero yo estoy frente a la verja de la familia Pons y no sé lo que le decía, cuando llegó Confesor y se avecinó a ellos dos y le disparó dos tiros.—P.—¿Quién disparó los dos tiros?—R.—Ese señor. (Señalando al acusado.)— P.—¿Con qué?—R.—Con un revólver Colt.—P.—¿A quién?—R.— A José Lago."

Repreguntado por la defensa se sostuvo en su dicho. Preguntó el juez y el testigo contestó:

"P.—¿Qué ocurrió entonces después de los disparos?—R.—Entonces el individuo salió huyendo diciendo 'policía, policía.'—P.— ¿Quién decía policía?—R.—José Lago 'me mata este individuo, que me mata' y a los dos minutos se avecinó el policía y le dije 'el que disparó los tiros está arriba.' Subió y bajó con él."

Al terminar de declarar Quiñones, el fiscal llamó al policía Martínez y le preguntó si había oído declarar a José Lago en la corte municipal y contestó que sí y al comenzar a decir: "Él declaró . . ." ocurrió lo que sigue:

"Abo.—Me opongo a la declaración del testigo sobre estos extremos.—¿Qué se propone el fiscal, impugnar su propio testigo?—Fis.— Sí, señor.—Abo.—Eso será para una persecución contra él. Además, este señor no hizo más que oír allí declarar testigos en un juicio y ahora va a venir ante la Corte para tener que confiar en su memoria.

en cuanto a la declaración de José Lago en la Corte Municipal.—
Fis.—Eso va a la credibilidad que le de la Corte.—Abo.—Sabe su
señoría la costumbre que hay en todas las cortes, que cuando declara
un testigo sale del salón, y me extraña mucho que este testigo oyera
la declaración de los siguientes testigos cuando es una regla que se
pide por todos los abogados defensores.—Fis.—En primer lugar
puedo decir que este testigo es el primero que figura en la denuncia,
y una vez que declaran los testigos permanecen en la corte; pero en
segundo término eso sería una cuestión para la credibilidad del tes-
tigo, eso no lo hace incompetente para declarar, ni un motivo, porque
la ley de evidencia diga que un testigo es incompetente eso va a si
él dice o no verdad. Será un argumento para la otra parte para
si él dice o no verdad.—Juez.—Se permite la declaración.—Abo.—
Excepción.—Fis.—P.—¿Qué declaró José Lago en la Corte Munici-
pal?—R.—Ese día declaró en la Corte Municipal que esa noche, es-
tando hablando con el trigueño ese, bajó Confesor de arriba, estando
él hablando con él, y que le disparó dos tiros a boca de jarro.—
P.—¿Quién declaró eso?—R.—José Lago.—P.—¿Ese mismo testigo
que ha declarado aquí?—R.—Sí, señor.—Fis.—Ahora solicito de V. H.
que se cite al señor Aybar, Juez Municipal.—Juez.—Pueden traerlo.—
Fis.—Anuncio que voy a presentar una moción para que V. H. más
tarde, al oír la declaración del juez municipal, procese por desacato,
por perjurio, al testigo José Lago.''

La declaración del juez, si es que fué citado y la prestó,
no aparece en el récord.

La defensa continuó repreguntando ampliamente al tes-
tigo.

Declaró por último como testigo de cargo Pedro Gorbea
que, en parte, dijo:

''R.—Lo primero que ví fué un grupo de gente allí afuera; me
arrimé y en eso dice uno 'allí viene el gallego', miré y efectivamente
ví a ese que le dicen el gallego, José Lago, venía de prisa y salió al
encuentro de uno que llegó, Bernardino González, y se pusieron a
hablar y entonces sonó un disparo y yo ví a Confesor Méndez en
actitud de haber disparado y estar disparando. No puedo decir que
él hizo el disparo pero ví el relámpago que salió del grupo de él. Es-
taba un poco obscuro, pero no puedo decir si tenía revólver, pero
puedo decir que el relámpago fué más cerca del grupo de él que de
los otros dos individuos.''

El acusado presentó como prueba las declaraciones de

Eustaquio Ortiz, Bernardino González, Eugenio Márquez y Eugenio Larroca.

El primero declaró que estaba en el sitio, sintió los disparos, vió la aglomeración de gente, vió al acusado pero no que hiciera los disparos, y vió a José Lago pasar por su lado corriendo. En igual sentido declaró el segundo.

Eugenio Márquez, o sea el tercero, dijo:

"R.—Nosotros estábamos parados en la 16, en el Club de Amigos del Oeste, arriba en el salón, cuando sentimos dos detonaciones, nos asomamos abajo y ví a José Lago que subía para arriba. No sé nada más.—P.—¿Vió a Confesor Méndez allí?—R.—Sí, señor, hablando con nosotros estaba.—P.—¿Después de eso qué pasó?—¿Después de los dos disparos?—R.—Después que Lago subió para arriba, llegó un guardia, Martínez, y entró al Casino y le dijo a Confesor 'deme ese revólver que dicen ahí que disparastes dos tiros' y le dice él 'no tengo ninguno' y le dice él 'deja registrarte' y lo registró y no encontró nada, entonces en otra parte miró y había un revólver encima de una silla y lo ocupó.—P.—Nada más.—Fis.—P.—¿Es hermano del acusado?— R.—Sí, señor.—P.—¿No sabe quién disparó?—R.—No, señor."

Eugenio Larroca, contestó:

"R.—Ese día yo subía por la calle Monserrate, la otra esquina que queda donde pasó el suceso y estando allí esperando guagua para ir a Sunoco, entonces vivía allá, sentí como dos detonaciones y me dirigí al sitio y entonces corría José Lago como para el sitio que estaba yo y llegó allí; al poco rato bajó el guardia, subió al Casino y bajó con este señor."

Expuestos los hechos, se observa que el incidente abarca dos momentos. No creemos que pueda sostenerse que exista error en el primero. El fiscal se limitó a pedir que se practicara una investigación a los efectos de determinar si el testigo Lago había cometido o no desacato por perjurio.

Declaró el testigo Quiñones y se desarrolló entonces la segunda parte del incidente en la forma que conocemos.

La regla es que a la parte que presenta un testigo no le es permitido impugnar su veracidad probando que es persona de mala reputación, pero sí, por disposición expresa de la ley—artículo 243 del Código de Enjuiciamiento Crimi-

nal—"podrá contradecirlo, aduciendo pruebas en contrario, y demostrar que en ocasiones anteriores, ha hecho manifestaciones que no concuerdan con su actual declaración."

Y así en verdad debe ser. Antes de llamar a declarar a una persona la parte debe cerciorarse de su reputación. Tiene una amplia oportunidad para ello y no puede quejarse si no investiga. Pero no obstante la más escrupulosa investigación, en el momento del juicio puede resultar que el testigo declare algo que sea realmente perjudicial a la parte que lo llamó y que sea contrario a lo que de él esperaba. Y la parte no debe quedar huérfana de defensa. Por eso la ley le permite contradecirlo en la forma indicada, esto es, aduciendo pruebas en contrario o demostrando que en ocasiones anteriores hizo manifestaciones que no concuerdan con su actual declaración.

La jurisprudencia ha sido muy celosa de que ese derecho que la ley reconoce a la parte no salga de sus verdaderos límites y estamos enteramente conformes con la que establece "que el mero hecho de dejar un testigo de prestar declaración favorable a la persona que lo ha presentado, no da derecho a tal parte a probar que ese testigo ha hecho en otras ocasiones manifestaciones contradictorias, las que si se declararan bajo juramento durante el juicio, tenderían a probar el caso" (27 Cal. Jur. 173) pero ésa no es aquí la situación.

Aquí la declaración de Lago prestada ante la corte era perjudicial al Pueblo que lo llamó como su testigo. No se trataba de una simple negativa. Lago era el perjudicado. Contra él rezaba la denuncia que había disparado el acusado. Quiñones manifestó que oyó decir a Lago cuando corría "me mata este individuo, que me mata." Para robustecer el testimonio de Quiñones, que sostenía por entero la acusación, el fiscal creyó conveniente contradecir el de Lago. La negativa de Lago envolvía una afirmación dañosa para la causa del Pueblo y si el fiscal lograba demostrar que Lago había hecho no ya simples manifestaciones, sino que había

prestado una declaración bajo juramento contraria a su actual declaración, tenía derecho a que se le diera una oportunidad para presentarla, no para probar con ella su caso, sino para contradecir con ella el actual testimonio del testigo.

Ahora bien, el artículo 245 del Código de Enjuiciamiento Criminal, lee como sigue:

"Art. 245.—También puede ser impugnada la veracidad de un testigo por medio de prueba que demuestre que en ocasiones anteriores ha hecho manifestaciones que no concuerdan con su actual declaración; pero antes de hacerlo, se le referirán dichas manifestaciones, con expresión de la época, lugares y personas que hubieren estado presentes al hacerlas, y se le preguntará si dichas manifestaciones fueron hechas por él, permitiéndosele que las explique, si contestare afirmativamente. Si las manifestaciones fueren escritas, se enseñarán al testigo antes de interrogarle acerca de ellas."

Es cierto que el fiscal no ajustó como debió ajustar su actuación estrictamente al procedimiento fijado por el precepto legal que antecede. El fiscal comenzó bien. Sabemos que preguntó al testigo si había declarado en la corte municipal y al obtener una respuesta afirmativa, si había declarado lo mismo que declaraba. Contestó también afirmativamente el testigo y el fiscal insistió: "Está seguro?" y respondió el testigo: "Sí, señor."

En ese momento nada sabía el fiscal, según sus propias manifestaciones. Quizá nada sabía tampoco, cuando llamó a declarar por segunda vez al guardia Martínez, después de la declaración del testigo Quiñones, pero es lo cierto que tuvo la oportunidad de enterarse y entonces llamar de nuevo a Lago y cumplir con la regla, dándole la oportunidad de explicar la contradicción.

Pero el no haberse cumplido estrictamente con la regla si bien constituye un error, no creemos que deba considerarse como perjudicial atendidas todas las otras circunstancias que concurren en el caso y la enfática y repetida afirmación de Lago de haber declarado lo mismo en la corte municipal cuando según la declaración de Martínez fué fun-

damentalmente distinto. Además, no hubo objeción específica a la manera de introducir la prueba y esto por sí solo sería bastante para dejar de considerar esta segunda parte del error.

Por último, no debe perderse de vista que el juicio no se celebró ante un jurado sino ante el tribunal de derecho conocedor de la ley y de la jurisprudencia y por tanto que no debe presumirse que la corte diera a la declaración del policía en relación con lo declarado por Lago en la corte municipal, un alcance contrario a la jurisprudencia y a la ley.

En cuanto al tercero y último error señalado, o sea que la sentencia es contraria a la ley y a la prueba, bastará para sostener que no existe recordar lo que resolvimos al estudiar el primer señalamiento y referirnos a la declaración de Quiñones que por sí sola, creída como fué, puede servir de base al fallo condenatorio dictado.

*Debe confirmarse la sentencia recurrida.*

El Juez Asociado Señor Wolf disintió.

#### OPINION DISIDENTE DEL JUEZ ASOCIADO SR. WOLF

La opinión de la mayoría, citando de 27 Cal. Jur. 173, sienta la regla de que el mero hecho de que un testigo deje de prestar declaración favorable, tal como se esperaba, no hace que esté sujeto a ser contradicho por declaraciones anteriores. Entonces, sin embargo, la conclusión de la mayoría es que tal no es la situación que tenemos ante nos, y que la declaración fué perjudicial a El Pueblo; que aquí no se trata de una simple negativa.

En primer lugar, no me parece que la exposición de la regla existente no da una idea perfecta del estado de la ley. Durante largo tiempo la regla fué que si bien una de las partes podía demostrar que sus testigos estaban equivocados, no obstante, no podía impugnar su veracidad. La historia de la regla fué discutida hábilmente en el caso de *Crago* v. *State,* 202 Pac. 1099. El artículo 243 del Código de Enjui-

ciamiento Criminal concede un remedio y permite que se contradiga a un testigo, y, por tanto, que sea impugnado en determinados casos específicos. Fuera de estas excepciones, la mejor autoridad es que una parte que presenta un testigo está impedida de impugnarlo. La ley es en la actualidad que antes de poderse contradecir a un testigo éste debe haber dicho algo que sea perjudicial que tienda por sí sólo a perjudicar el caso de la parte que lo presenta. Es razonable que de acuerdo con la regla, antes de que una de las partes pueda contradecir a un testigo, éste deba haber declarado algo que sea perjudicial.

Las autoridades demuestran que cuando un testigo niega positivamente la existencia de cierto hecho, puede demostrarse que anteriormente este testigo aseveró la existencia de tal hecho. Entonces, su declaración no equivale a que se dejara meramente de declarar, sino a la aserción de la no existencia de determinado hecho.

Si Lago hubiese dicho que no se hicieron disparos hubiera podido contradecírsele para demostrar que él había manifestado que se había disparado.

Si Lago hubiese dicho que Confesor Méndez no había hecho los disparos, pudo habérsele contradicho para demostrar que él había manifestado lo contrario. Todo lo que Lago dijo en la silla testifical a este respecto fué que no había visto a Confesor Méndez hacer los disparos. Para contradecir esta declaración, El Pueblo debió haber demostrado que Lago había hecho manifestaciones tendentes a demostrar que él en realidad había visto a Méndez disparar; en otras palabras, destruir su negativa sobre un hecho especial y positivo. La aproximación más cercana a esto fué su grito de "¡me mata ese individuo!"

No se introdujo inconsistencia alguna. Muy bien cabe dentro del campo de las posibilidades que Lago dijera en la corte municipal que Confesor Méndez le había disparado,

pero tuvo que admitir en la repregunta que no había visto los disparos, y que no podía declarar positivamente quién los había hecho.

El Pueblo pudo haber extraído de Lago toda la verdad mediante un interrogatorio. Se dejó de hacerlo. Convengo con la opinión de la mayoría en que el acusado renunció al error cometido por El Pueblo al no sentar las bases adecuadas para contradecir a este testigo, pero insisto en que la prueba ofrecida no tendió a contradecir a Lago, y que El Pueblo dejó de aprovecharse de la oportunidad de descubrir toda la verdad.

Nada hallo en los autos que haga caer los hechos dentro de cualquiera de las excepciones a la regla de *estoppel* sugerida. El efecto de la presentación de la prueba era traer ante la corte prueba de referencia debidamente objetada, y la declaración era claramente perjudicial. De lo contrario, ¿para qué la insistencia tenaz del fiscal en presentarla?