El Pueblo de Puerto Rico, demandante y apelado, *v.* Carlos Marchand Paz, acusado y apelante.

Núm. 6639.—*Sometido:* Abril 18, 1938. *Resuelto:* Julio 28, 1938.

*Luis Muñoz Morales, R. V. Pérez Marchand, Angel M. Villamil, Alfonso Lastra Chárriez* y *Angel D. Marchand Paz,* abogados del apelante; *R. A. Gómez, Fiscal,* abogado de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR WOLF emitió la opinión del tribunal.

En la noche del 5 de junio, 1936, el policía Orlando Colón fué muerto de heridas de bala en el momento en que se disponía a subir la escalera que conducía a su hogar. Del testimonio del Dr. Basilio Dávila, que fué el médico que practicó la autopsia, se desprende que el interfecto fué atacado por la espalda y que tres balas le penetraron en el cuerpo. Posteriormente el aquí apelante, Carlos Marchand Paz, fué arrestado y acusado del anterior asesinato. Luego de alegar su inocencia, el acusado fué llevado a juicio el 11 de diciembre de 1936, y siete días más tarde convicto por un jurado del delito de asesinato en segundo grado. La Corte de Distrito de San Juan, luego de declarar sin lugar una moción de nuevo juicio, le sentenció a veinte años de presidio con trabajos forzados.

El acusado apeló tanto de la sentencia como de la resolución declarando sin lugar la moción de nuevo juicio. Es conveniente exponer la teoría del fiscal y la de la defensa.

"Asesinato en primer grado" fué la piedra angular del caso del Pueblo contra el acusado. Éstas fueron las palabras finales del fiscal al presentarse el caso al jurado:

"Señores del Jurado, ése es el caso que el fiscal les va a presentar a ustedes, y una vez que el fiscal pruebe esos hechos, como los probará, yo voy a solicitar de ustedes el único veredicto que puede dictarse en el presente caso: un veredicto de asesinato en primer grado."

La teoría del fiscal fué que el acusado en la noche del crimen acechó y siguió de cerca al policía mientras éste se dirigía a su hogar; que cuando el policía se disponía a subir por la escalera o había ya subido varios escalones, el acusado le hizo dos disparos que le hirieron mortalmente, y que mientras caía en brazos de su esposa, le disparó e hirió por tercera vez. Para establecer un motivo y para demostrar el probable estado de ánimo del acusado poco antes de la muerte, el fiscal se propuso ofrecer prueba de los disparos

que tuvieron lugar en Río Piedras en octubre de 1935 y a consecuencia de los cuales cuatro o cinco miembros del Partido Nacionalista fueron muertos por la policía. Dió énfasis al hecho de que el acusado era nacionalista y de que al ser arrestado entregó al periodista Enrique Ramírez Brau el reloj de uno de los nacionalistas muertos en Río Piedras, llamado Pepito Santiago, con las siguientes instrucciones:

"Hágame el favor de entregarle esto a don Pedro Albizu Campos; le dice que ése es el reloj de Pepito Santiago, que se lo envía Carlos Marchand Paz."

Con igual fin el fiscal anunció que probaría que el policía especial, Cándido Antonmattei, más o menos tres semanas antes del asesinato, se le llamó un día como a media noche, para que interviniera en relación con una bandera nacionalista que había sido izada en la Alcaldía de Río Piedras; que encontró allí a un grupo de jóvenes nacionalistas, entre ellos al acusado, y que cuando trató de investigar el incidente fué atacado por el grupo, el cual le desarmó y le agredió con su propio roten, pegándole entonces el acusado en la cara.

La defensa presentó una teoría doble. Descansó en una coartada respecto al sitio donde se hallaba el acusado en la noche en que se cometió el delito, y en la supuesta confesión del crimen por un tercero.

■■ Los dos primeros señalamientos suscitan la cuestión relativa a la admisión de evidencia para establecer un motivo o estado de ánimo. Se hace objeción más particularmente a las declaraciones de Cándido Antonmattei y Domingo Beniamino.

Antonmattei declaró en relación con el incidente en la Alcaldía de Río Piedras ocurrido una noche poco antes del asesinato. Beniamino describió el curso de los acontecimientos que culminaron en la muerte de cuatro o cinco nacionalista en octubre de 1935. Tanto el fiscal como los letrados de la defensa han asumido que se puede admitir prueba que

tienda a demostrar el motivo o el estado de ánimo del cual se pueda deducir más fácilmente la intención o la probabilidad de la comisión del delito. El motivo, desde luego, desempeña un papel importante en todo delito, y por esa razón es un eslabón muy importante en la prueba de cargo. En aquellos casos en que la culpabilidad depende de evidencia circunstancial, la prueba de motivos es, por supuesto, aún más importante.

En lo referente a la declaración de Antonmattei, el juez sentenciador dijo:

"La corte entiende que la evidencia que se ofrece es admisible para probar el móvil y el estado de ánimo en que se hallaba el acusado en aquellos días. Se admite la evidencia."

Los letrados de la defensa se anotaron una excepción.

La declaración de Beniamino fué admitida por la corte como parte del motivo, y el acusado se anotó otra excepción.

Aunque no nos ha sido posible hallar una exposición clara y concisa de este supuesto motivo o estado de ánimo, es más o menos patente que el fiscal trataba de establecer la existencia de un feudo entre la policía y los miembros del Partido Nacionalista, feudo que tuvo su origen en los desgraciados sucesos de Río Piedras. Acontecimientos posteriores que son en la actualidad de conocimiento público, han confirmado de sobra la naturaleza de la animosidad creada o aumentada por este incidente de Río Piedras. Los nacionalistas dieron a conocer públicamente su negativa a reconocer la autoridad establecida del Gobierno americano en la isla. Desde luego, aún era necesario asociar o conectar al aquí acusado con esta actitud rebelde. El primer paso era demostrar que él participó activamente en un incidente que le identificó con el movimiento hostil contra el Gobierno. No debe perderse de vista el hecho de que el edificio escogido por Marchand y sus compañeros como centro de operaciones fué el asiento del gobierno local de Río Piedras. El acometimiento y agresión contra Antonmattei estuvo aparentemente injustificado;

puesto que la defensa no ofreció prueba alguna para demostrar provocación física por parte del testigo. Éste fué suficientemente pertinente para demostrar la actitud temeraria del acusado y sus secuaces hacia un policía. El incidente caracterizó al acusado como un miembro activo más bien que como un miembro pasivo del Partido Nacionalista, y demostró especialmente el odio que sentía hacia la policía.

La prueba conectó razonablemente al acusado con el grupo de supuestos nacionalistas que se sentía personalmente ofendido por los poderes ejercidos por la policía, y que manifestaba la determinación de hacer caso omiso de su autoridad. Toda la prueba ha de ser considerada en conjunto. El tiroteo de Río Piedras y el incidente en el municipio, conforme fueron presentados ante el jurado, no fueron a nuestro juicio, perjudiciales al acusado en la forma que él ahora sostiene, aunque no es menester que se dé indebido énfasis a la afiliación nacionalista de éste. Salió a relucir claramente durante la repregunta que el acusado no estuvo en manera alguna envuelto en los sucesos de octubre de 1935. De no haberse presentado prueba directa contra el acusado, el jurado pudo haber ignorado completamente la anterior prueba sobre estos hechos.

En la mayoría de los casos citados por el apelante, y especialmente en el caso de *Pueblo* v. *Juarbe,* 43 D.P.R. 448, se presentó prueba específica sobre la comisión de un delito con el fin de demostrar una intención criminal. No se logró en absoluto conectar los delitos entre sí. La prueba contra el acusado era puramente circunstancial. El riesgo de perjuicio contra el acusado fué tan grande que destruía su ligera pertinencia. Estamos dispuestos a convenir con el apelante en que de ordinario la comisión de un delito no es admisible para demostrar su repetición en el caso específico que se ventila. En verdad, la regla general es contraria a su admisión, excepto en aquellos casos en que se ofrecen los hechos para demostrar un designio, motivo, intención o algo similar, y se demuestra que son claramente pertinentes para dicho

fin. Véase Wigmore on Evidence, Tomo 1, párr. 216, pág. 462. De no ser pertinentes, deben ser excluídos por estar en pugna con la regla sobre reputación (*character rule*). Creemos que en este caso la evidencia presentada ofrecía una inferencia razonable sobre el designio, motivo o intención para la comisión del delito y además que la misma no resultaba tan perjudicial al acusado que debió haberse excluído debido a su tendencia a probar demasiado. En su consecuencia los dos primeros errores no fueron cometidos.

 El origen de los dos próximos señalamientos fué el incidente que sigue: El primer testigo de la defensa lo fué Antonio Rivera Córdova. De las preguntas héchasle se desprendía que los letrados trataban de sacarle que admitiera o confesara su culpabilidad. Sin embargo, el testigo negó tener conocimiento alguno del caso y negó también enfáticamente haberle confesado a un tercero.

Inmediatamente después el acusado puso a declarar al testigo Cáceres Barreras, y le preguntó: "¿Le hizo Antonio Rivera Córdova alguna manifestación?" El fiscal se opuso a la pregunta y, luego de retirarse el jurado de la sala de sesiones, argumentó extensamente sobre la inadmisibilidad de cualesquiera manifestaciones que Rivera Córdova pudiera haber hecho al testigo, fundándose en que prueba de la admisión o confesión de un extraño, al efecto de que él cometió el delito, no era admisible como prueba sustantiva tendente a exonerar al acusado. La corte sostuvo la objeción y el acusado se anotó una excepción.

Los letrados del apelante entonces solicitaron se les permitiera impugnar a su propio testigo Rivera Córdova, ofreciendo prueba demostrativa de declaraciones anteriores inconsistentes. El fiscal se opuso nuevamente y fué sostenido por la corte. El acusado se anotó una excepción más.

Aunque los señalamientos son más detallados, ellos imputan sustancialmente error a la corte sentenciadora al negarse a admitir prueba tendente a demostrar que un tercero, es decir, un extraño, y no el acusado, era el verdadero

culpable y al negarse a permitir prueba de impugnación sobre manifestaciones anteriores inconsistentes.

Irrespectivamente de cuál hubiera sido el supuesto fin, no hay duda de que el verdadero motivo de la defensa al ofrecer las declaraciones de Cáceres Barreras y Antonio Moreau, nacionalistas ambos, y compañeros del acusado, fué establecer uno de los principales fundamentos de la defensa, a saber, la culpabilidad de un tercero. Creemos que la corte inferior se percató de ese designio fundamental e hizo cuanto estuvo a su alcance para impedir su admisión. Estamos más o menos convencidos de que si la prueba ofrecida no era admisible *per se,* ella fué correctamente excluída cuando se trató de introducirla con el objeto de impugnar el propio testigo del acusado. La conclusión a que llegó la corte inferior al efecto de que uno no puede realizar indirectamente aquello que no puede hacer directamente, es correcta a nuestro juicio. Al considerar el estado de la jurisprudencia sobre esta cuestión específica, hemos hallado que el gran cúmulo de las autoridades sostienen la resolución de la corte inferior. Desde el tribunal más alto de los Estados Unidos para abajo se ha resuelto consistentemente que tal prueba es primordialmente inadmisible. Véanse las monografías que aparecen en 35 A.L.R. 441 y 48 A.L.R. 348, para una buena discusión de la regla y sus excepciones. El caso de *Donnelly* v. *U. S.,* 228 U. S. 243, es una autoridad cumbre para ese criterio y, en cuanto sepamos, no ha sido revocado o modificado. Para casos posteriores que citan el de Donnelly, supra, puede referirse a Roses' Notes on U. S. Reports, Tomo 7, Suplemento de 1932, págs. 1050 *et seq.* Es cierto que en el estado de Tejas y quizá en otras pocas jurisdicciones, ha habido alguna desviación de la regla general. Empero, la tendencia, aun en esas jurisdicciones excepcionales, ha sido ceder en la aplicación de la regla tan sólo en casos extremos en que la prueba contra el acusado es enteramente circunstancial y el caso está rodeado de otras circunstancias especiales que no existen en el presente caso.

El apelante trata de calificar la prueba en este caso como de puramente circunstancial. Para llegar a esta caracterización sostiene que la prueba de los "testigos oculares" debió ser descartada por indigna de crédito. Aún asumiendo que debió haberse seguido la regla excepcional, el juez no podía anticipar o decidir para sí si estos testigos iban a ser creídos o no por el jurado y mucho menos actuar a base de esa decisión para admitir la prueba. La posición no ha sido bien asumida.

Como la prueba era inadmisible para establecer la defensa afirmativa de una confesión de culpabilidad por parte de un tercero, ella tampoco podía ser admitida bajo el pretexto de impugnar la declaración de un testigo del propio acusado.

Este tribunal ha resuelto continuamente que el fiscal no puede ofrecer prueba para contradecir uno de sus propios testigos, a menos que el fin de la prueba sea clara e inequívocamente destruir el efecto de tal declaración. La prueba nunca es admisible para contribuir a presentar un caso positivo en favor del Pueblo. *Pueblo* v. *Rojas,* 16 D.P.R. 251; *Pueblo* v. *Méndez,* 39 D.P.R. 653; *Pueblo* v. *Marrero,* 41 D.P.R. 951; *Pueblo* v. *Lafontaine,* 43 D.P.R. 23; *Pueblo* v. *Plata,* 36 D.P.R. 590; y casos mencionados en las citas anteriores; *People* v. *Creeks,* 141 Cal. 529; *People* v. *Sliscovich,* 193 Cal. 544; 74 A.L.R. 1042.

La misma regla es aplicable necesariamente a la tentativa del acusado a establecer su propia defensa contradiciendo a uno de sus propios testigos.

 Los señalamientos quinto y sexto se dirigen a algunas de las instrucciones del juez sentenciador en relación con el delito de asesinato en segundo grado.

No se anotaron excepciones y el principio enunciado en los casos de *Pueblo* v. *Cardona,* 50 D P.R. 108 y *Pueblo* v. *Hernández,* 49 D.P.R. 419 y en los casos allí citados, es aplicable. Dudamos que la corte jamás cometa error al dar al acusado la oportunidad de ser convicto de asesinato en

segundo grado en vez de asesinato en primer grado. 16 C. J. 1024, sec. 2452; *State* v. *Bell,* 136 Mo. 120, 37 S. W. 823; *People* v. *Thiede,* 11 Utah 241, 39 Pac. 837 y 13 R.C.L. 757, 781.

A letrados hábiles siempre les es posible, en casos adecuados, demostrar que el acusado debe ser convicto de asesinato en primer grado o absuelto.

Existen otros señalamientos que fácilmente pueden ser subsanados en un nuevo juicio.

Difícilmente puede darse demasiado énfasis a la importancia del séptimo error señalado. El campo de los comentarios por parte del fiscal y la defensa al dirigirse al jurado luego de terminada la prueba, ha sido trillado con tanta frecuencia por las cortes, que poco es lo que pòdemos agregar. Una regla fundamental de conducta es que no debe permitirse comentario alguno en torno a cuestiones que no han sido traídas ante el jurado durante el curso del juicio. El apelante sostiene que esta regla fué violada por el fiscal y que tal infracción claramente fué perjudicial al caso del acusado. A continuación aparece lo sucedido.

El acusado sostiene que el fiscal hizo al jurado en su informe de rectificación una observación que resultaba claramente perjudicial al caso del acusado y que no estaba en absoluto sostenida por la prueba. Esta contención fué presentada a la corte inferior en una moción de nuevo juicio y fortalecida por cuatro o cinco *affidavits* de miembros del jurado que manifestaban haber oído tal observación. Los *affidavits* eran necesarios debido a que el juez sentenciador preparaba en aquellos momentos un bosquejo de las instrucciones y el incidente escapó su atención. Por desgracia el letrado principal de la defensa se hallaba en aquellos momentos fuera del salón de sesiones. Nunca se ofrecieron contraaffidavits y el fiscal aparentemente ha guardado silencio sobre la cuestión. De las declaraciones anteriores tomamos las siguientes versiones:

Ricardo R. Pesquera, presidente del jurado, declaró bajo juramento:

"... que recuerdo perfectamente bien que el señor fiscal Romany, al informar en ese caso ante nosotros, como jurados, se expresó en la forma siguiente al referirse al testigo que la defensa había llevado como autor del crimen. Dijo el señor fiscal en forma despectiva: 'Que el individuo Rivera Córdova, después de haber declarado, había estado en su oficina a informarle que hasta le habían ofrecido dinero para que se embarcara a Estados Unidos y así poderlo inculpar.'"

Teodoro Viera, miembro del jurado, declaró:

"... Que recuerdo con bastante exactitud que en dicho caso, cuando el señor fiscal Marcelino Romany estaba informando... al referirse al testigo Rivera Córdova, que la defensa había presentado como el presunto matador del Policía Colón, dijo lo siguiente: 'Este testigo Rivera Córdova, después que declaró, fué a mi oficina a manifestarme que a él le habían ofrecido $30 para que se embarcara y entonces acusarlo como el culpable.'"

Guillermo Ortiz, miembro del jurado, declaró:

"... que oí perfectamente bien cuando el fiscal Hon. Marcelino Romany, dijo... que Rivera Córdova, testigo de la defensa... había ido a su oficina a decirle a él, al fiscal, que le habían ofrecido dinero para que se embarcara y así inculparlo del crimen de Colón. ..."

En adición a ello, hubo *affidavits* de los jurados Laureano Carús y Luis C. Cuyar, que más o menos corroboraban los anteriores. En varios de los *affidavits,* los deponentes exponían el efecto que tal observación tuvo sobre el veredicto.

Al presentársele esta cuestión al juez sentenciador en una moción de nuevo juicio, la corte la resolvió a base de la regla general existente en California al efecto de que la conducta o manifestación impropia del fiscal no puede ser revisada ni servir de fundamento a una revocación o nuevo juicio a menos que la defensa se oponga inmediatamente a los actos impropios y dé a la corte la oportunidad de subsanar su efecto perjudicial. *People* v. *Amer,* 151 Cal. 303; *People* v. *Fleming,* 166 Cal. 357, y otros. La corte mencionó también el hecho de que el letrado no se hallaba presente y sugirió

que una instrucción general en que advertía al jurado que sólo tomara en consideración la prueba que estaba ante sí, había subsanado el efecto de la observación. El juez de la corte inferior reconoció la bien conocida excepción a la regla anterior, o sea, que cuando la conducta o manifestación es tan perjudicial que no puede propiamente ser subsanada con una instrucción, el dejar de presentar una objeción no impide que la cuestión sea suscitada en apelación. *People* v. *MacDonald,* 167 Cal. 545, 551; *People* v. *Edgard,* 34 Cal. App. 459, 167 Pac. 891; *People* v. *Sheffield,* 293 Pac. 72 y muchos otros casos. Sin embargo, la corte inferior, luego de hacer un análisis de la prueba, llegó a la conclusión de que el grado de credibilidad de Rivera Córdova era tan insignificante, que con toda probabilidad la manifestación del fiscal no había tenido efecto positivo en el jurado, y que cualquier ligero efecto que hubiese tenido podía ser fácilmente subsanado o disipado por una instrucción especial.

Antonio Rivera Córdova fué llamado por el acusado con el fin expreso de lograr que él confesara haber dado muerte a Orlando Colón. No obstante, su declaración fué enteramente de carácter negativo y no se permitió que su deficiencia fuera subsanada ni por prueba positiva ni indirectamente, mediante testigos de impugnación. El supuesto matador confeso asumió un aire de absoluto desconocimiento de toda la situación. La defensa le preguntó expresamente si no había estado en cierta finca en la madrugada del domingo siguiente al viernes en que se dió muerte al policía y en la cual, con Cáceres, Moreau y Marchand, el acusado, les informó que había matado a Colón y que al que dijera algo "le metía plomo en el cuerpo." El testigo negó todo esto.

Bajo las anteriores circunstancias tenemos que asumir que el jurado tenía conocimiento de la supuesta defensa. El fiscal destruyó con éxito toda tentativa de ofrecer, con otros testigos, prueba de la intervención de Rivera Córdova en el asesinato. Él pudo razonablemente haber terminado allí y haber confiado, en vista de la prueba directa que existía

contra el acusado, en que se traería un veredicto condenatorio. Sin embargo, no satisfecho con su caso contra el acusado, manifestó al jurado que el testigo había ido a su oficina, luego de declarar en corte, y le había manifestado que la defensa le había ofrecido dinero (algunos dicen que $30), la cuantía no es importante, para que abandonara la isla y el acusado pudiera incriminarlo. No podemos exonerar al fiscal de un motivo ulterior al hacer esta manifestación al jurado. Podría colegirse inmediatamente que su fin principal fué demostrar que el acusado trataba de fabricar una defensa, y lo que es aun peor, el fiscal trataba de realizar su fin en una forma que en cuestiones similares hemos condenado y que no son toleradas por la corte. *Pueblo* v. *Rojas,* y otros, supra. Si se recuerda que el mismo fiscal se había opuesto a toda prueba o comentario sobre la cuestión por parte de la defensa, su actuación resulta aun más injustificada. Ésta no era una cuestión de evidencia impropia admitida debido a que la parte contraria no se había opuesto, sino un caso en que se presenta directamente al jurado y no mientras se admite la prueba, testimonio perjudicial que con toda probabilidad no se hubiera podido ofrecer desde la silla de los testigos.

La conducta del fiscal con toda probabilidad ya había dejado una marca indeleble en el ánimo de los jueces de hecho. La manifestación del fiscal, de ser creída por el jurado, tendió a demostrar una admisión de culpabilidad por el acusado e indirectamente acusó a la defensa del serio crimen de tratar de sobornar a un testigo. No podemos determinar todo el efecto de semejante manifestación, pero a nuestro juicio, resultó inevitablemente perjudicial.

Existe tal abundancia de jurisprudencia sobre lo que constituye suficientemente un comentario impropio y exige la devolución de un caso para nuevo juicio, que no se puede establecer una regla definida. Cada caso ha de fundarse en sus hechos específicos. Para alguna jurisprudencia sobre este punto, podemos citar 2 R.C.L. 438, párr. 35, y 16 C. J.,

sec. 2242; 3 Wigmore 837, sec. 1806, *et seq.* Los hechos del caso que está ante nos hablan por sí solos. No hay duda alguna de que el jurado recibió de labios del fiscal algo que equivalía a evidencia inadmisible y estamos convencidos de que la naturaleza perjudicial de esa prueba no pudo ser subsanada por nada que el juez pudiera haber dicho. El daño fué irreparable.

*Nos sentimos obligados, por lo tanto, en justicia al acusado, a resolver que las observaciones hechas por el fiscal en este caso, al efecto de que el testigo Antonio Rivera Córdova había ido a su oficina y había manifestado que la defensa le había ofrecido dinero para que abandonara la isla y pudiera incriminársele, fueron totalmente impropias, y perjudiciales para el acusado, y exigen que la sentencia de la corte inferior sea revocada y el caso devuelto para un nuevo juicio, y así se ordena.*

El Juez Asociado Señor De Jesús no intervino.