EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.*
PEDRO MÁRQUEZ, acusado y apelante.

Núm. 11596.—*Sometido:* Diciembre 13, 1947. *Resuelto:* Mayo 19, 1947.

*César Andréu Ribas,* abogado del apelante; *Hon Procurador General Interino Luis Negrón Fernández, y Joaquín Correa Suárez, Fiscal Auxiliar del Tribunal Supremo,* abogados de El Pueblo, apelado.

El Juez Asociado Señor Todd, Jr., emitió la opinión del tribunal.

Pedro Márquez fué acusado de un delito de asesinato en primer grado por haber dado muerte a Pedro A. Pagán, convicto por un jurado del delito imputado y sentenciado por la Corte de Distrito de San Juan a reclusión perpetua. Solicitó un nuevo juicio que le fué denegado. Apeló tanto de la sentencia como de la denegatoria de nuevo juicio y como primer señalamiento alega que la corte inferior erró al no permitir que el jurado oyera y conociera las declaraciones de los testigos de defensa Pedro Antonio Maysonet y Pedro Antonio Díaz.

■■ El propósito del testimonio de los testigos antes mencionados era demostrar que el delito no fué cometido por el acusado sino por un tercero llamado Pedro Huertas Torres. Según alega el apelante, Pedro Huertas Torres hizo manifestaciones en relación con la muerte de Pedro A. Pagán en presencia de los testigos Maysonet y Díaz. Surgió el incidente cuando prestaba declaración el testigo Maysonet, quien, a preguntas de la defensa, contestó como sigue:

"P. ¿Quién es éste? R. Pedro Huertas Torres, conocido por Pedro el Malo.

"P. ¿Ésta es la persona con quién usted habló ese día? R. Sí, en casa de Aguelín.

"P. ¿Quién es Aguelín? R. Una viejita que vende licor.

"P. ¿Usted habló con él, relacionado con el crimen? R. De Pagancito.

"P. ¿Qué le dijo? R. El me dijo . . .

"Sr. Fiscal: Objeción por ser de referencia.

"P. ¿Qué le dijo Pedro Huertas Torres conocido por Pedro El Malo a usted en relación con el crimen de Pagancito?

"Sr. Fiscal: No conteste. Objeción.

"Sr. Juez: Es de referencia. Con lugar la objeción.

"Defensa: Yo voy a plantear una cuestión de derecho y no tenemos objeción que el jurado la oiga. En este caso suplicamos que se le dé la oportunidad al acusado de demostrarle al jurado que no fué él sino que fueron otros dos los que intervinieron y le dieron

muerte a Pagán. Pedimos a V. H. que medite profundamente y que se permita al acusado que traiga esa prueba.

"Sr. Juez: La Corte le va a permitir a la defensa que presente toda la prueba que desee para demostrar que no fué el acusado sino que fueron otras dos personas las que cometieron ese hecho, pero tiene que hacerlo con prueba competente, no con testigos que vengan a decir que fulano me dijo tal o cual cosa. La Corte no tiene duda sobre esa cuestión y cree que no puede en forma alguna venir un testigo a decir que fulano de tal me dijo que yo maté a Pagancito. Eso no es admisible y el Jurado no debe resolver el caso nada más que con la prueba que se practique aquí y sería colocar al Fiscal en desventaja porque no tendría la oportunidad de repreguntar. Con lugar la objeción del Fiscal.

"Defensa: Para eso tenemos a Pedro Huertas Torres para que la otra parte le repregunte.

"Sr. Juez: Que venga Huertas Torres a decir lo que sabe.

"Sr. Fiscal: Yo quiero decir que se retire el Jurado.

"Defensa: Yo no quiero que el Jurado pierda más tiempo. ¿La reconsideración la niega la Corte?

"Sr. Juez: Sí.

"Defensa: Excepción. Que se entienda que el testigo Pedro Antonio Díaz sería ofrecido por la defensa a corroborar que presenció la misma conversación sobre la cual declararía Pedro Maisonet y que nos vemos imposibilitados de ofrecer por la resolución de la Corte."

No tenemos duda de que la prueba que pretendió presentar el apelante era prueba de referencia y por lo tanto fué debidamente excluída. En el caso de *El Pueblo* v. *Marchand Paz*, 53 D.P.R. 671, surgió una cuestión similar y resolvimos, citando del sumario, que: "Evidencia para establecer la defensa afirmativa de una confesión de culpabilidad por parte de un tercero, es inadmisible. . ." Véase, además, *Donnelly* v. *United States*, 228 U. S. 243; 35 A. L. R. 441 y 48 A. L. R. 348.

██ Como segundo señalamiento se alega que la corte inferior erró al no instruir al jurado sobre el delito de homicidio voluntario.

No aparece de la transcripción de evidencia que la defensa tomara excepción de las instrucciones dadas por la

corte al jurado, ni pidiera instrucción adicional alguna. Es en la solicitud de nuevo juicio que se levanta esta cuestión por primera vez y por tanto renunció a cualquier error que pueda existir en las instrucciones. *El Pueblo* v. *Rosado,* 17 D.P.R. 441; *Pueblo* v. *Millán,* 66 D.P.R. 243. Además, la prueba en este caso, habiendo negado el acusado toda participación en el delito imputádole, no justificaba que la corte inferior diera instrucciones sobre el delito de homicidio voluntario.

 Como tercer error se alega que el veredicto rendido, de asesinato en primer grado, es contrario a la prueba, siendo ésta enteramente circunstancial y compatible con la hipótesis de inocencia. Veamos, en síntesis, cuál fué la prueba.

El día 2 de diciembre de 1944 apareció muerto en una habitación contigua al cafetín de su propiedad, situado en el Barrio Obrero, de Santurce, Pedro A. Pagán, conocido por "Pagancito". Según aparece de las declaraciones de varios agentes de la Detective y de la Policía Insular, que estuvieron a cargo de la investigación, el cuerpo del interfecto yacía sobre el suelo en un charco de sangre, con una toalla bien apretada al cuello y heridas contusas sobre distintas partes de la cabeza. De acuerdo con la declaración del Dr. Llobet, que practicó la autopsia del cadáver, la toalla que tenía Pagán amarrada al cuello le fracturó el hueso de la quijada y los cartílagos de la laringe, y las heridas en la cabeza le fracturaron el cráneo. Y sostiene el perito que Pagán pudo haber muerto o bien de los golpes en la cabeza o por estrangulación; que la muerte de Pagán ocurrió de ocho a diez horas antes de practicarle la autopsia a las once de la mañana, o sea, entre una y tres de la madrugada. Inmediatamente después que la Detective y el fiscal se hicieron cargo de la investigación y sin que se hubiera removido o en alguna forma perturbado el estado de cosas según fueron descubiertas, se tomaron dos fotografías por un empleado de la Policía, que aparecen como *Exhibits* 1 y 2 de El Pueblo. Junto al cadá-

ver aparecieron varias cajas de cartón vacías que estaban salpicadas y manchadas de sangre. En el cafetín había también desorden, pues el cajón del dinero apareció sobre la nevera y además había un número de monedas regadas sobre el piso del establecimiento. Se encontró luego y en un sitio muy poco visible, dos potecitos que contenían $130 en billetes, hallazgo éste que fué hecho por el hijo del interfecto que sabía donde su padre guardaba el dinero. La prueba de cargo tendió a demostrar que el acusado le pidió una peseta a Justo García y luego de obtenerla, dirigirse al cafetín de ''Pagancito'', beberse un palo de ron y pagarle uno a Aníbal García Iguina. Después el acusado le exigió a ''Pagancito'' que le diera otro palo gratis a lo cual se negó el interfecto. Tuvieron una discusión por este motivo y el acusado abandonó el establecimiento. Esto ocurrió entre siete y media y ocho de la noche del primero de diciembre. Otro testigo de cargo declaró que vive frente a la residencia del acusado en Hato Rey y lo vió llegar la noche del primero de diciembre como a las doce de la noche, borracho y desordenando. Según dice el testigo: ''Aquella noche había llegado más fuerte que nunca y yo tengo una bombilla al frente que la puse con esa idea y entreabrí la ventana y lo ví y él vestía pantalón kaki y botas amarillas de cuero y camisa de listas y un sombrero y entonces la mamá le abrió la puerta y él dijo: 'acaba de abrir, no jodas más, acabo de darle un trastazo a uno por allá. . . .' ''

Demostró además la prueba que el día 2 de diciembre, o sea, el día que se encontró el cadáver, se dirigió el acusado al Barrio Bairoa, de Caguas, a casa de unos parientes que hacía muchos años que no visitaba, vistiendo pantalón kaki, zapatos negros y botas brown. Se encontró con Isabel Rodríguez, a quien le pidió prestada ropa para cambiarse la que llevaba puesta. Ella le dió un pantalón y una camisa de su hermano y el acusado se cambió de ropa y dejó la suya para que Isabel se la lavara y al ésta hacerlo, notó que la camisa y el pantalón estaban manchados de sangre. El acusado

se fué y regresó al Barrio Bairoa otra vez el sábado siguiente, día 9 de diciembre, con una caja de cartón la cual contenía artículos de vestir y de cama, brocha, espejo, pasta, cepillo y un martillo. Esta caja era similar a las cajas de cartón que aparecieron en la habitación de "Pagancito" y además tenía manchas como de sangre. Ese día el acusado se cambió de ropa nuevamente y al irse se llevó el martillo envuelto en un papel. Luego la testigo entregó la ropa que le había prestado al acusado, la reconoció el día del juicio así como la del acusado que ella había lavado. Declaró, además, que las manchas en la camisa y pantalón del acusado estaban por el frente y que sabía que eran de sangre porque ella se ha cortado, es lavandera y sabe lo que es sangre y se conoce la sangre cuando se seca que es negra.

El día 23 de diciembre se encontró el acusado en una plena con Víctor Villegas Márquez en Caguas. Hablaron un rato y según relata Villegas, sucedió que: "Seguimos en la plena y nos paramos más abajo de un palo y entonces Pedro Márquez me dijo: '¿en qué usted anda?', y yo le dije: 'yo ando huyendo de unos casos,' y el me dijo: 'yo ando huyendo de un caso que me acusan que maté a Pagancito.'" Estas manifestaciones del acusado fueron oídas por Ignacio Velázquez, otro testigo de cargo, con la diferencia de que lo que oyó este testigo decir al acusado fué: "eso no es nada, yo también estoy huyendo de unos cuantos casos en la corte de Río Piedras y uno que maté por el Barrio Obrero."

Después de haber terminado la plena y como a las siete de la noche partieron Villegas y el acusado para el Barrio La Muda, de Caguas, a visitar una amiga de Villegas llamada Patria Mercedes López. Llegaron de siete y media a ocho de la noche en estado de embriaguez y haciendo mucho ruido. El acusado le manifestó a Patria López, entre otras cosas, que: "Yo soy aquel enmascarado que sale en el 'Imparcial' que maté al comerciante del Barrio Obrero, Pagancito, y hasta que no mate al muchachito que me delató no me en-

trego.'' Momentos después llegó la Policía que había sido informada que Villegas estaba allí y al arrestar a Villegas, que estaba huyendo pues se le acusaba de unos delitos de ataque para cometer violación, fueron llevados al cuartel de Guaynabo. En el libro de novedades se hizo constar que el acusado fué arrestado por alterar la paz. Días después se le acusó por la muerte de Pagán.

La prueba del acusado tendió a demostrar que la noche del primero de diciembre el acusado vivía en Hato Rey y se acostó a las nueve de la noche de dicho día y se levantó a las seis de la mañana del día 2 de diciembre para ir a trabajar a un friquitín, propiedad de un tal Chano situado en la parada 25. Que siguió trabajando por un término de una semana al cabo de la cual abandonó el empleo dirigiéndose al Barrio Bairoa, de Caguas, el día 9 de diciembre, y no el día 2 como declararon los testigos de cargo, y que allí trabajó una semana.(¹) Trató de probar, además, el acusado que el delito había sido cometido por Pedro Huertas Torres, pero la corte inferior se negó, correctamente, a recibir evidencia de referencia a este efecto. Además declaró Melitón Morales Guzmán quien dijo que como a las once de la noche vió salir del callejón al lado del cafetín de Pagán, a dos hombres, uno era Ramón Pagán, hermano del interfecto, y el otro Pedro Huertas Torres. Negó que hubiera estado por el cafetín de Pagán la noche de la muerte de éste y que lo hubiese matado. También presentó prueba para impugnar la veracidad de varios testigos de cargo.

La prueba en este caso fué de carácter circunstancial. Arguye el apelante que no es suficiente para sostener el veredicto rendido por ser compatible con cualquier teoría razonable de inocencia y porque no se probó el *corpus delicti*. No tiene razón a nuestro juicio. El corpus delicti quedó establecido por prueba directa: la declaración del Doctor Llobet en

(¹) La prueba de cargo negó que el acusado hubiera trabajado en dicho barrio.

cuanto a que la muerte fué consecuencia de estrangulación o fractura del cráneo y la identificación del cadáver de Pagán. La prueba circunstancial o de indicios relacionó y conectó al acusado con la comisión del delito en tal forma que la hace incompatible con cualquier hipótesis razonable de inocencia.

Aparece de dicha prueba que el acusado estuvo en el cafetín de Pagán la noche en que ocurrieron los hechos y tuvo una discusión con él con motivo del ron que no quiso fiarle; que más tarde la misma noche le oyeron decir, en estado de embriaguez, que le había dado "un trastazo a uno por allá"; que al día siguiente se fué para el Barrio Bairoa de Caguas a la casa de unos parientes y que la ropa que dió a lavar allí estaba manchada de sangre; que a pesar de que el acusado alegó que había estado trabajando, la prueba de cargo negó ese hecho; que el acusado espontánea y voluntariamente hizo en distintos sitios y a distintas personas admisiones de que estaba huyendo del cargo que se le hacía de haber matado a Pagán y que él era el enmascarado que salía en "El Imparcial" que había matado al comerciante del Barrio Obrero y que hasta que no matara al que lo delató no se entregaba. ¿Con qué teoría razonable de inocencia puede ser compatible esta prueba? El jurado, debidamente instruído por la corte, creyó que con ninguna y, a nuestro juicio, el veredicto de culpabilidad está sostenido por la prueba. Correspondía al jurado determinar si daba crédito a los testigos que declararon que oyeron las admisiones extrajudiciales hechas por el acusado y además si de los hechos incluídos en dichas admisiones[2] conjuntamente con la demás prueba circunstancial, podían determinar, más allá de duda razonable, la culpabilidad del acusado. Así lo hizo dando crédito a los testigos de cargo y no estamos justificados en variar su determinación. No se cometió el error señalado.

Alega el apelante que erró la corte al permitir que el fiscal en su informe general al jurado hiciera mención del

---

[2] Véase 2 Wharton *Criminal Evidence*, sec. 649, *et seq.*, en cuanto al alcance probatorio de admisiones.

robo como móvil del crimen, cuando ni en la acusación ni en la prueba practicada en el juicio se alegó ni probó que el asesinato se hubiera cometido por el acusado en ocasión de perpetrar robo o de intentarlo.

No estamos en condiciones de poder determinar si se cometió el error señalado, ya que de los autos no aparece el informe del fiscal al jurado. La parte que alega error debe poner a la corte de apelación en condición de resolverlo. *Pueblo* v. *Cabrera,* 59 D.P.R. 135. No existiendo constancia alguna en los autos demostrativa de la naturaleza de las palabras del fiscal, no podemos considerar este señalamiento.

 Se señala, además, como error, el haber la corte admitido en evidencia fotografías del interfecto, marcadas Exhibits 1 y 2 de El Pueblo.

Las fotografías mencionadas fueron tomadas por un empleado de la Policía por orden de y bajo la supervisión y dirección del Sr. Juan Adames, Jefe de la Detective en San Juan. Como surge de su propio testimonio, ambas fotografías representan lo que él vió allí la mañana de la investigación sin que se hubiese cambiado o en alguna forma alterado el estado de cosas, según fueron halladas.

Una vez se prueba que una fotografía es una reproducción fiel y exacta de la persona, sitio o cosa que se pretende representar, dicha fotografía es admisible en evidencia y competente para probar cualquier cosa sobre la cual un testigo pueda dar una descripción oral que sea pertinente y material. 23 C.J.S. 51, sec. 852. Underhill, *Criminal Evidence,* pág. 157, sec. 117; *Illanas* v. *González,* 51 D.P.R. 803.

Habiendo demostrado la prueba de cargo que las fotografías son una verdadera representación del estado de cosas según fueron descubiertas en la habitación y el cafetín del interfecto y no habiendo la defensa ofrecido ninguna para refutar dicha prueba, no erró la corte inferior al admitir las fotografías en evidencia.

 Por último alega el apelante que erró la corte inferior al denegar su petición de nuevo juicio.

Consideraremos solamente aquellos fundamentos de la solicitud de nuevo juicio que no han sido ya discutidos y resueltos en esta opinión.

Alegó el acusado en su moción de nuevo juicio que "en ninguna parte de la prueba practicada por el Fiscal aparece el elemento de malicia y premeditación ni deliberado propósito de matar a Pedro A. Pagán . . ." No tiene razón el apelante. Las circunstancias en que se perpetró la muerte de Pagán dejan claramente establecida la malicia, deliberación y premeditación con que se llevó a efecto. Ya sabemos que Pagán fué golpeado con un arma contundente varias veces en la cabeza fracturándole el cráneo y que además fué estrangulado con una toalla. La evidencia ofrecida por El Pueblo es suficiente para establecer los diversos elementos del delito de asesinato en primer grado.

También alegó en dicha moción que "fué perjudicado por la circunstancia especial de que el jurado Sr. Braulio Caballero, fué obligado a permanecer en el jurado no obstante el hecho de haber anunciado en el momento de su insaculación que tenía que embarcar hacia los Estados Unidos el día 6 de mayo de 1945, y que esto le preocupaba grandemente," y que "con este motivo, y con el fin de no captarse la mala voluntad de dicho señor jurado en particular, se vió obligado a prescindir de presentar los testimonios de los testigos Feliciano Rodríguez Rivera, Juan Rodríguez Rivera conocido por Juan Bendito, Juan E. Adames, Jefe Auxiliar de la Detective, y Demetria Márquez, madre del acusado, testigos que hubieran declarado sosteniendo la defensa de coartada y otros extremos de la teoría expuesta por el abogado defensor."

Del récord ante nos no aparecen los procedimientos llevados a cabo en la corte inferior relacionados con la constitución del jurado. No podemos considerar este punto por los mismos fundamentos que no consideramos el cuarto error señalado, supra. Además, el acusado tuvo oportunidad de recusar al

jurado Caballero y no aparece del récord que lo hiciera. Ya:
hemos resuelto que un acusado no debe permanecer callado
cuando ocurre alguna anormalidad en el juicio que él consi-
dere perjudicial a sus derechos, y esperar hasta la termina-
ción del juicio para luego, en apelación, si el veredicto le es
adverso, señalar esta anormalidad como un error. *El Pue-
blo v. Arroyo,* ante, pág. 36.

▉▉▉ Si el acusado optó por no presentar a los testigos
arriba mencionados, lo hizo voluntariamente pues no aparece
del récord que él ofreciera presentarlos y se le hubiese ne-
gado ese derecho. Era al acusado a quien incumbía ofrecer la
prueba necesaria en apoyo de su defensa. Si él eligió pres-
cindir del testimonio de algunos de sus testigos, no puede
quejarse ahora de que esto le fué perjudicial.

Por último alega el apelante que la acusación le imputa
únicamente la comisión de un delito de asesinato en segundo
grado. Una somera lectura de la acusación demuestra que
contiene todos los elementos inherentes al delito de asesinato
en primer grado.

La moción de nuevo juicio fué correctamente denegada
por la corte inferior.

*Procede confirmarse la sentencia apelada.*

Los Jueces Asociados Sres. Snyder y Marrero no inter-
vinieron.