EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* SECUNDINO SANTANA PAZ, c/p CUNDI, acusado y apelante.

Número 15613.

*Sometido:* 3 de mayo de 1954. *Resuelto:* 7 de junio de 1954.

*C. H. Juliá* e *Hipólito Marcano,* abogados del apelante; *Hon. Secretario de Justicia José Trías Monge* y *Jaime García Blanco, Fiscal Especial, Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR MARRERO emitió la opinión del tribunal.

Secundino Santana Paz, conocido por Cundi, fué acusado ante el antiguo Tribunal de Distrito de San Juan del delito

de asesinato en primer grado por haber dado muerte con un arma de fuego, deliberada y premeditadamente, allá para el mes de julio de 1946, al ser humano Juan Pérez Cosme.   En la primera ocasión que se le sometió a juicio, el jurado no se puso de acuerdo.   En la segunda, sin embargo, rindió por unanimidad veredicto condenatorio.   Una moción de nuevo juicio presentada por el acusado fué declarada sin lugar, sentenciándosele entonces a la pena de reclusión perpetua.

De los trece errores señalados por el acusado en apelación, el tercero, cuarto y quinto son al efecto de que el tribunal sentenciador erró (3) al no permitir al testigo Antonio Colón Sanz declarar ante el jurado sobre los hechos por él vistos en el sitio de los sucesos; (4) ni respecto a quién fué la persona que le produjo la muerte a Pérez Cosme; y (5) al concluir que el testimonio de aquél era inadmisible, por ser la coartada la teoría del acusado, y que éste no tenía derecho a ofrecer prueba sobre lo ocurrido en el sitio de los sucesos; y el sexto, al no permitirle al testigo Ángel Colón declarar sobre los sucesos y sobre todo que él fué la persona que disparó y produjo la muerte de Juan Pérez Cosme.   El Secretario de Justicia, por conducto de un fiscal especial, se allana a la revocación de la sentencia por ser de opinión que los errores antes reseñados han sido cometidos.

El segundo juicio de este caso duró más de una semana y la transcripción de evidencia que ha sido elevada como parte de los autos, es verdaderamente voluminosa.   La hemos leído con el mayor cuidado.   El testimonio de Ramón Calo Feliciano, vendedor de periódicos de 14 años de edad, fué al efecto de que en la noche del 4 de julio de 1946 el occiso, que se hallaba en una panadería de su propiedad situada en la calle Providencia, de Santurce, le compró un ejemplar del periódico "El Imparcial" y de que, luego de él vender otro ejemplar del mismo diario allí enfrente, vió cuando Secundino Santana Paz, desde la cuneta que hay delante de la panadería, disparó un arma de fuego contra Pérez Cosme, así como que éste, en unión de otras personas persiguieron al agresor por la indi-

cada calle sin lograr capturarle. Los otros testigos de El Pueblo declararon en lo esencial así: *Lydia Pérez Rodríguez* es hija del interfecto; estaba en su casa y al oír los disparos salió precipitadamente hacia el establecimiento de su padre; al encontrarlo herido éste le manifestó que "Cundi, el hijo de Etanislao Santana, le había herido." *Santos Tite Reyes Ramos* habló con el acusado al día siguiente de los hechos y éste le negó haber participado en el atentado, indicándole que se había lavado las manos con alcoholado esa noche porque padecía de influenza. *María Cristina Soler* era novia del acusado; éste la acompañó hasta la panadería de Pérez Cosme, donde compraron dos bollos de pan, poniendo el acusado el precio de los mismos sobre el mostrador; mientras se dirigían a la panadería, Santana Paz le mostró un arma de fuego que tenía en el bolsillo trasero y le dijo "que a él le habían ordenado matar a don Juan Pérez Cosme"; minutos después de ella regresar a su casa oyó varios disparos. *Aida Pérez de Rivera* también es hija de Pérez Cosme; para aquel entonces los panaderos estaban en huelga; su padre que era dueño de la panadería "El Nuevo Trato", no obstante la huelga existente, fabricaba y vendía pan y en todo ello le ayudaban sus hijos; el domingo anterior a los hechos vió a Secundino Santana Paz parado frente a la panadería, mirando insistentemente hacia el interior de ésta. El *Dr. John Robert Bierley* operó al interfecto de las heridas recibidas.

La teoría de la defensa, como ya se ha sugerido, fué la coartada. Sus testigos, que fueron muchos, declararon haber visto al acusado trabajando el día de los hechos, desde temprano, en una "pica de caballitos" situada en la avenida Eduardo Conde, de Santurce.[1] *Antonio Colón Sanz*, sin embargo, declaró que el 4 de julio de 1946, como a las 9:30 de la noche,[2] vió a Juan Pérez Cosme. Al pedirle el letrado

[1] Según la prueba, del sitio donde estaba la "pica" a la panadería de Pérez Cosme una persona se tarda como diez minutos a pie.

[2] Ése es el día y la hora en que Pérez Cosme fué herido.

de la defensa que explicara dónde, cuándo y cómo lo vió, el fiscal solicitó del tribunal que ordenara que el jurado se retirara. Así se decretó. El fiscal manifestó entonces que como ésta era la segunda vez que se celebraba el juicio de este caso, él sabía que el testigo declararía que "vió cuando una persona que no es el acusado le hizo unos disparos a don Juan Pérez Cosme. Esa evidencia, señor Juez, es completamente inadmisible." El letrado de la defensa replicó que más o menos eso es lo que declararía el testigo "con la diferencia de que el testigo va a declarar que llegó a la panadería en el momento en que había una discusión entre don Juan Pérez y otra persona y que vió cuando esa otra persona hizo los disparos y que la vió correr. Que entonces se le fué detrás junto con otros." Se discute ampliamente la cuestión y el tribunal sostuvo la objeción del fiscal, indicando que "el criterio del tribunal es que cuando se invoca como defensa una coartada, o sea la defensa de que la persona a quien se acusa no se encontraba en el sitio de los hechos, . . . a esa persona no le importa nada de lo que pasó en el sitio de los sucesos. Por tanto, es inadmisible prueba tendente a establecer lo que pasó en el sitio de los sucesos . . . lo que él tiene que probar es lo que anunció en su defensa, o sea que él no estaba allí. Por eso es inadmisible cuando se establece la defensa de coartada." Luego de denegársele la reconsideración que solicitó, la defensa se anotó una excepción. Regresó entonces el jurado a la sala del tribunal y en presencia de aquél el testigo manifestó que frente a la puerta de la panadería había dos personas, y que pudo reconocerlas bien. Preguntado si ocurrió algo entre esas dos personas, el fiscal se opuso a la pregunta y el tribunal sostuvo la objeción. Continuó declarando el testigo que ninguna de esas dos personas se encuentra en la sala del tribunal y que está absolutamente seguro de ello; que después de ver a esas dos personas siguió detrás de una multitud que caminaba acompañando a Pérez Cosme; que la persona que vió en la panadería se había ido corriendo y que esa persona no se parecía

al acusado, "porque la persona que yo ví correr cuando estaba frente a la panadería de don Juan Pérez era un tipo más bajito, grueso, bastante trigueño; ésa es la razón por la cual no se parecía a él. . . . Bueno, yo seguí detrás de la multitud y del señor Juan Pérez hasta llegar a la esquina de la calle que atraviesa que se llama Barbosa; entonces de allí para allá él desistió de la persecución del supuesto agresor, del que disparó, y entoces viró para atrás con la multitud y entonces vino la hija de él." Al anunciarse al testigo *Ángel Colón*, El Pueblo, que por razón del juicio anterior tenía asimismo conocimiento de lo que éste declararía, solicitó nuevamente que se retirara el jurado. Así se ordenó por el tribunal. En ausencia del jurado el testigo explicó que siendo él panadero conocía a Pérez Cosme, a quien vió en su panadería el 4 de julio de 1946, como a las nueve y media de la noche; que Pérez Cosme estaba solo y despachaba pan; que habló con él, Pérez Cosme lo botó de allí y se puso pico a pico con él; que entonces él echó a correr calle arriba, al llegar a una esquina dobló y brincó una palizada; que para aquel entonces conocía a Secundino Santana Paz y que en ningún momento vió a éste en los alrededores de la panadería, desde que llegó allí hasta que se fué corriendo. El fiscal alegó que la prueba era inadmisible y el juez manifestó "lo que le parece al tribunal es que, permitirle al testigo que declare ante el jurado como lo ha declarado ahora, sería hasta cierto punto preferible dejarlo declarar que él fué el que lo mató, porque entonces el jurado lo creería o no lo creería; mientras que ahora lo que va a crear es una confusión en la mente del jurado. Así es que se sostiene la objeción del fiscal. El tribunal resuelve que no es admisible por los fundamentos expuestos anteriormente, máxime cuando se trata de una persona que se anunció que habría de declarar que fué él el que mató al señor Juan Pérez Cosme. Esa prueba, de acuerdo con la jurisprudencia de Puerto Rico y de California sería inadmisible." La defensa solicitó se reconsiderara la resolución del tribunal, así como que a los efectos del récord se

permitiera tomarle al testigo, en ausencia del jurado, la declaración que éste prestaría. El juez autorizó entonces que se formara un récord separado del testimonio del testigo. Lo pertinente de ese testimonio, que como ya se ha indicado figura como prueba ofrecida y no admitida, es la siguiente:

"P.—¿Tenga la bondad de decirnos qué fué lo que usted habló con don Juan Pérez cuando entró?

"R.—Bueno yo le dije a don Juan, 'don Juan, usted no podría dejar de vender pan dos o tres semanas en lo que se arregla la huelga de panaderos para que los padres de familia puedan llevar el sustento a sus hogares;' entonces él inmediatamente me dijo, 'acabe de largarse de aquí' y me botó. Entonces yo brinqué a la acera, al brincar a la acera, cogí (sic) rápido, cuando ya yo había brincado a la calle, me dijo 'acabe de largarse de aquí" entonces él haló un revólver así y yo tenía una pistola; entonces él me hizo un disparo y yo le hice otro. Yo me fuí a correr, entonces él me hizo un disparo, yo brinqué el patio. . . ."

■ Es doctrina casi universal que la *confesión extrajudicial* de un tercero en relación con el delito que se ventila no es admisible en evidencia en el juicio seguido contra otra persona. *Pueblo* v. *Marchand Paz*, 53 D.P.R. 671; *Pueblo* v. *Camacho*, 66 D.P.R. 859; *Pueblo* v. *Márquez*, 67 D.P.R. 326; *Donnelly* v. *United States*, 228 U. S. 243, 57 L. ed. 820; 162 A.L.R. 450; 133 A.L.R. 1455; 48 A.L.R. 348; 22 C.J.S., pág. 1286, sec. 749; 26 Am. Jur. 420; *People* v. *Lettrich*, 108 N.E.2d. 488; *Owensby* v. *State*, 2 So. 764. La razón fundamental para la no admisión de semejante confesión extrajudicial es que la misma constituye prueba de referencia, que es, por ende, inadmisible. En algunos de los casos arriba citados la persona que hacía la confesión había muerto al momento de ofrecerse la misma en evidencia. En otros, esa persona no estaba en corte, o se hacía referencia a tal confesión para impugnar el testimonio de otra persona que al ser interrogada sobre la misma negaba haberla hecho.

Esos casos, no obstante, son distinguibles del presente. En *Pueblo* v. *Marchand Paz*, supra, los letrados de la defensa hicieron esfuerzos para que Antonio Rivera Córdova, su pri-

mer testigo, admitiera o confesara su culpabilidad. El testigo negó tener conocimiento del caso y negó también, de manera enfática, haberle confesado a un tercero. Inmediatamente la defensa puso a declarar a otro testigo y le preguntó si Rivera Córdova le había hecho alguna manifestación. El fiscal se opuso a la pregunta y, retirado el jurado de la sala, argumentó extensamente sobre la inadmisibilidad de cualesquiera manifestaciones que Rivera Córdova pudiera haber hecho al testigo. Su objeción fué sostenida. Solicitó entonces la defensa que se le permitiera impugnar a su propio testigo Rivera Córdova, ofreciendo prueba demostrativa de declaraciones anteriores inconsistentes. El fiscal se opuso y una vez más el tribunal le sostuvo. Este Tribunal en el curso de su opinión dijo a la pág. 678:

"Estamos más o menos convencidos de que si la prueba ofrecida no era admisible *per se,* ella fué correctamente excluída cuando se trató de introducirla con el objeto de impugnar el propio testigo del acusado. . . . Desde el tribunal más alto de los Estados Unidos para abajo se ha resuelto consistentemente que tal prueba es primordialmente inadmisible,"

citándose 35 A.L.R. 441 y 48 A.L.R. 348, e indicándose que el caso de *Donnelly* v. *United States,* supra, es una autoridad cumbre para ese criterio. Sin embargo, se indicó asimismo que "en el estado de Tejas y quizá en otras pocas jurisdicciones, ha habido alguna desviación de la regla general," y que "la tendencia aun en esas jurisdicciones excepcionales, ha sido ceder en la aplicación de la regla tan sólo en casos extremos en que la prueba contra el acusado es enteramente circunstancial y el caso está rodeado de otras circunstancias especiales que no existen en el presente caso." Se aceptó, pues, que la anterior regla tiene sus excepciones.

En *Pueblo* v. *Camacho,* supra, el apelante fué convicto del delito de asesinato en segundo grado cometido en la persona de *Fabián de Jesús.* El jurado le declaró culpable de homicidio voluntario: Toda la prueba de El Pueblo fué directa. La defensa llamó como testigo a un tal Flores e hizo a éste

varias preguntas tendentes a probar cierta confesión hecha por *Francisco de Jesús*.  En apelación se reafirmó el principio anteriormente enunciado.

En *Pueblo* v. *Márquez*, supra, Pedro Márquez fué acusado del delito de asesinato en primer grado y sentenciado a reclusión perpetua, por haber dado muerte a Pedro A. Pagán.  En apelación imputó al tribunal sentenciador haber errado al no permitir que el jurado oyera y conociera las declaraciones de los testigos de defensa Pedro Antonio Maysonet y Pedro Antonio Díaz.  El propósito del testimonio de éstos era demostrar que el delito no fué cometido por el acusado sino por un tercero llamado Pedro Huertas Torres, quien según se alegaba había hecho manifestaciones en relación con la muerte de Pagán en presencia de los testigos Maysonet y Díaz.  Citándose el caso de *Marchand Paz*, supra, se dijo a la pág. 329, que: "evidencia para establecer la defensa afirmativa de una confesión de culpabilidad por parte de un tercero es inadmisible."

En *Donnelly* v. *United States*, supra, aquél fué acusado y convicto del delito de asesinato por haber dado muerte a un indio.  Una de las cuestiones discutidas en apelación fué si la evidencia tendente a demostrar una supuesta confesión de un tal Joe Dick había sido rechazada debidamente.  Dick había muerto para la época en que se celebró el juicio contra Donnelly.  El Tribunal Supremo de la nación resolvió que el inferior había actuado acertadamente al rechazar esa evidencia.  En el curso de su opinión dicho Tribunal hizo referencia a la regla que excluye prueba de referencia e indicó que en las cortes estatales del país es casi unánime la regla de no admitir confesiones extrajudiciales de terceras personas que tiendan a exonerar al acusado.  En ese caso, sin embargo, el Juez Holmes disintió y en su opinión disidente concurrieron los Jueces Lurton y Hughes.

La regla que hace inadmisible las confesiones extrajudiciales de un tercero es, a nuestro juicio, enteramente correcta y enteramente sabia.  Tenemos, no obstante, que admitir que

la misma ha sido objeto de severas censuras, tanto de parte de algunos tribunales como de parte de ilustres tratadistas. Por ejemplo, el profesor Wigmore en su conocida obra sobre Evidencia—vol. V, tercera ed., pág. 289—luego de referirse a la regla que comentamos, de citar la opinión disidente del Juez Holmes en el caso de *Donnelly* v. *United States* y de indicar por qué se ha resuelto que la confesión de un tercero es inadmisible en evidencia, se expresa así:

"Por consiguiente, aún no es demasiado tarde para echar una mirada retrospectiva ni para descartar esa 'bárbara doctrina,' que no permite que un inocente acusado de delito se vindique a sí mismo ofreciendo al tribunal una confesión perfectamente auténtica, hecha en el patíbulo mismo por el verdadero culpable, que se halla ahora fuera del alcance de la justicia. Aquéllos que con verdadera indignación siguieron en 1899 el curso de los procedimientos contra el Capitán Dreyfus recordarán que de haberse celebrado ese juicio ante nuestros propios tribunales, el espectáculo hubiera sido no menos bochornoso si nosotros, siguiendo nuestros supuestos precedentes, nos hubiésemos negado a admitir lo que el tribunal francés ni por un solo instante se negó a admitir—la confesión auténtica del escurridizo comandante Esterhazy, declarándose culpable de la traición allí imputada, y quien no hay un ápice de duda fué el verdadero traidor."

Sea ello como fuere, en el presente caso la situación es completamente distinta. Aquí no se trata de confesiones extrajudiciales de un finado, ni de confesiones extrajudiciales de personas que están fuera del alcance del tribunal. Se trata por el contrario de declaraciones de personas que se hallaban ante la corte y que estaban listas y dispuestas a declarar sobre hechos que a ellas les constaban de propio y personal conocimiento, relacionados con la comisión del delito que se ventilaba y que se imputaba al acusado. Tales declaraciones eran claramente admisibles. Fué, por tanto, un error perjudicial el excluirlas y por ello procede la revocación de la sentencia apelada.

Sobre una situación como la aquí envuelta, Wharton, en el volumen 1 de su obra sobre "Evidencia Criminal", 11ª ed. (1935), se expresa así a la pág. 348, sec. 274:

*"El acusado en una causa criminal puede, mediante evidencia adecuada, probar que otra persona cometió el delito que a él se le imputa, cuando la culpabilidad de esa otra persona es consistente con la inocencia del acusado."* (Bastardillas nuestras.)

Underhill, en su tratado sobre "Evidencia Criminal," cuarta ed., pág. 588, sec. 296, al discutir la defensa de coartada (*alibi*) manifiesta:

"Puede que con frecuencia el acusado recurra a la defensa de que otra persona cometió el delito, especialmente en aquellos casos en que la prueba del estado es circunstancial. *Se ha resuelto generalmente que tal evidencia es admisible, de estar relacionada con el res gestae y siempre que la culpabilidad de esa otra persona sea consistente con la inocencia del acusado y haya hechos en evidencia que tiendan a demostrar la culpabilidad de una persona distinta al acusado.* Si la evidencia es circunstancial todo ángulo razonable debe ser explorado y no debe excluirse ninguna evidencia que tienda a demostrar la culpabilidad de otra persona, a menos que sea demasiado indefinida y demasiado remota en cuanto a tiempo." (Bastardillas nuestras.)

Wigmore, en su obra citada—vol. I, tercera ed. sec. 139, págs. 573, 574—al discutir la cuestión relativa a la comisión del delito por un tercero termina diciendo que:

"Si bien tal prueba tiene por miras que surjan dudas en la mente de los señores del jurado, el tribunal no debe tratar de decidir por el jurado mismo que tales dudas son puramente especulativas y fantásticas, sino que debe conceder al acusado toda oportunidad para crear semejantes dudas. Una regla contraria sería injusta para un acusado que en realidad sea inocente."

Véanse también 26 Am. Jur. 382 y 420, secs. 335 y 380; 15 Am. Jur. 22, sec. 331; 121 A.L.R. 1363; *Hines* v. *Com.*, 136 Va. 728, 117 S. E. 843; 35 A.L.R. 431; *State* v. *Russell*, 220 Pac. 552; *Commonwealth* v. *Murphy*, 185 N. E. 486; *Quinn* v. *State*, 25 P.2d 711, 714; *Horn* v. *State*, 73 Pac. 705; *Phillips* v. *State*, 203 Pac. 902.

Los tribunales del propio estado de California, de donde fueron tomados tanto nuestro Código Penal como nuestra Ley de Evidencia, se expresan en el sentido de que "este Tribunal (el Supremo de California) ha resuelto que siempre es apropiado demostrar que alguna otra persona, y no el acusado, cometió el delito que a este último se imputa." *People* v. *Erno*, 232 Pac. 710, 713; *People* v. *Perkins*, 59 P.2d 1069, 1074; *People* v. *Vatek*, 236 Pac. 163, 171.

El caso de *Thomas* v. *State*, 167 A.L.R. 390, 47 A. 2d 43, guarda bastante similitud con el presente. Los hechos envueltos en el mismo fueron los siguientes: el 16 de julio de 1945, poco después de las seis de la tarde se halló en la sala de su hogar fatalmente herido al anciano James Furbush, quien vivía solo. El 20 de julio Furbush falleció en el hospital como resultado de las heridas recibidas. Wilbert Melvin y su esposa Nellie fueron arrestados y acusados del asesinato de Furbush. Al día siguiente cada uno de ellos firmó una declaración respecto a la forma en que habían atacado al occiso, y varios días más tarde se sometió el caso de ellos al gran jurado. En septiembre, sin embargo, se arrestó a William Albert Thomas por haber asaltado a Furbush con intención de robarle, y en noviembre se le acusó del asesinato de éste. Durante el juicio contra Thomas el estado ofreció en evidencia una confesión suscrita por el propio Thomas en presencia del alguacil y de dos policías del estado. Thomas ocupó la silla testifical en su propio beneficio, juró que no sabía leer y que creyó que la confesión que hizo se refería al atentado contra un tal Hickey Cooper. Se llamó entonces a Wilbert Melvin como testigo del acusado. Declaró que fué a la casa de Furbush el 16 de julio, que salió para Centerville en busca de licor y que al regresar se halló con que Furbush ya estaba herido. El tribunal se negó a permitir que Melvin declarara si había sido arrestado por la muerte de Furbush o si había firmado una declaración con relación al asesinato. Al presentársele la declaración que aparentemente había firmado el 21 de julio en presencia del

alguacil y de dos policías, Melvin admitió que la firma parecía ser la suya, mas la corte se negó a admitir en evidencia esa declaración. Lo mismo sucedió con el testimonio de la esposa de Melvin. En el curso de su opinión la Corte de Apelaciones del Estado de Maryland discute la doctrina relativa a la exclusión de confesiones extrajudiciales hechas por terceras personas, menciona el caso de *Donnelly* v. *United States*, supra y hace referencia a la fuerte censura que a esa regla ha hecho el profesor Wigmore, calificándola de "doctrina bárbara." Termina el Tribunal de Maryland diciendo:

"Resolvemos que cuando un testigo ha hecho una confesión escrita admitiendo haber cometido el delito que se imputa al acusado, a éste debe permitírsele que introduzca en evidencia tal confesión y que interrogue a ese testigo con respecto a la misma y en torno de las circunstancias en que hizo tal confesión."

Estamos enfáticamente contestes con la doctrina expuesta por todos esos casos y tratadistas. Esa doctrina en forma alguna deroga la establecida por *Donnelly* v. *United States*, supra. Por el contrario, la amplía.

Repetimos que el presente caso es distinguible de los de *Pueblo* v. *Marchand; Pueblo* v. *Márquez* y *Pueblo* v. *Camacho*, resueltos por este propio Tribunal, así como del de *Donnelly* v. *United States* y otros que han seguido el principio sobre confesiones extrajudiciales en él establecido. Aquí no se trata de una confesión extrajudicial de un tercero, ya muerto o fuera del alcance del tribunal, sino del testimonio de testigos oculares, de testimonio que de por sí era admisible en evidencia. El acusado tenía derecho a que ese testimonio fuera oído por el jurado ante el cual se ventiló su caso. Al rechazarse el mismo y al no permitirse que el jurado lo oyera, es innegable que sus derechos fueron perjudicados.

Dada la anterior conclusión, no es menester discutir los demás errores señalados.

*Debe revocarse la sentencia apelada y devolverse el caso al Tribunal Superior de Puerto Rico, Sala de San Juan, para la celebración de un nuevo juicio.*